[No. C007769. Third Dist. Apr. 30, 1991.]

SACRAMENTO OLD CITY ASSOCIATION et al., Plaintiffs and Appellants, v
CITY COUNCIL OF SACRAMENTO, Defendant and Respondent.

1012

## COUNSEL

Kathryn Burkett Dickson, Jeffrey A. Ross, Gay C. Danforth and Trent W. Orr for Plaintiffs and Appellants.

James P. Jackson, City Attorney, and Evelyn M. Matteucci, Deputy City Attorney, for Defendant and Respondent.

## OPINION

DeCRISTOFORO, J.*—Plaintiffs Sacramento Old City Association, Elaine Hamby, and Susan Steinsapir (SOCA) appeal from the denial by the Sacramento Superior Court of a writ of mandamus sought pursuant to the California Environmental Quality Act (CEQA). In their writ petition, SOCA sought to set aside the decision of defendant, City Council of Sacramento (the City) to expand the downtown Sacramento Convention Center complex (the center) and to construct an office tower at 1325 J Street (the office tower). Plaintiffs also sought an injunction against the future demolition of the Merrium Apartments until the City prepares an adequate environmental impact report (EIR) on the project. On appeal, plaintiffs argue the EIR approved by the City is inadequate under CEQA. Plaintiffs contend the EIR is deficient because: (1) the EIR fails to adequately address mitigation of parking and traffic impacts; (2) the EIR contains insufficient findings concerning parking and the destruction of the Merrium Apartments.[1]

We find the record supports the City's certification of the community center expansion. Therefore, we shall affirm the judgment.

---

* Retired Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.

[1] This action originally included D. Benvenuti Properties and Daniel Benvenuti, Jr., the developer of the officer tower, as real parties in interest. Subsequent to the filing of this appeal, plaintiffs entered into a settlement agreement with those two real parties in interest, providing for dismissal of the appeal as to those said parties. On January 10, 1991, we granted plaintiff's request for dismissal of real parties in interest D. Benvenuti Properties and Daniel Benvenuti, Jr. Since those issues are no longer before us, we do not consider or address any of the contentions which had been directed to the office tower.

FACTUAL AND PROCEDURAL BACKGROUND

In 1987, the City proposed an expansion of its existing community convention center, located in downtown Sacramento. After considering various studies, the City determined the existing center was unable to attract and accommodate its full potential of convention-related events. This failure was partially based on size constraints of the existing center.

The City also sought, by enlarging the existing center, to further its goal of the revitalization of downtown Sacramento. As part of this downtown revitalization, the City proposed the development and support of an entertainment/hotel district in downtown Sacramento, expanding outward from the existing center. In a report, the City noted, "it has been broadly agreed that this district should be such that the performing arts, restaurants and retail establishments can all flourish. An expanded convention capability will serve to provide increased financial support to these activities, in addition to existing local support. [¶] Indeed, the location of an expanded, vital, Community/Convention Center in the entertainment/hotel district will serve to counteract those forces currently drawing development away from the central core, and will allow these sought after downtown activities to thrive." The City began formal consideration of expansion of the center.

Subsequently, the City's Planning and Development Department received applications from several developers for special permits to allow construction of high-rise office towers within a block of the center. The City, citing the geographic proximity of the office towers to the center and the resulting interrelated environmental issues, decided to prepare a single EIR, covering the proposed office towers and the expansion of the center.[2]

The City commissioned a marketing analysis to provide space planning requirements for the proposed center expansion. This analysis recommended an additional 140,000 gross square feet of exhibit, meeting and ballroom space and additional loading dock facilities in order to realize the center's full market potential. The analysis proposed no specific design for the expansion.

The City considered 5 design alternatives for the proposed expansion: north (175,000 additional square footage); east (130,000 additional square footage); west (135,000 additional square footage); a SOCA alternative (210,000 additional square footage); and a no-project alternative.

---

[2] The draft EIR discussed the environmental impacts of office towers at 1215 "K" Street, 1325 "J" Street (the office tower) and 1301 "I" Street. The latter project was dropped before the issuance of the final EIR. Plaintiffs do not challenge the adequacy of the "K" Street tower EIR on appeal.

The City prepared and made available a draft EIR. In the draft EIR each of the five proposed alternatives to the center expansion and each of the three proposed office towers were evaluated in fourteen subject areas: land use; historic preservation and cultural resources; population; employment; housing; visual quality; traffic circulation and parking; noise; air quality; microclimate; public services; fiscal impacts; geology and soils; and biotic resources. Under each subject area the draft EIR analyzed any potential impacts and listed potential mitigation measures. The draft EIR also considered the cumulative impacts of the various proposed center expansion alternatives when combined with one or more of the office towers.

Several public hearings were held on the draft EIR. In addition, written comments were submitted to the City, and ultimately incorporated into the final EIR. At the public meetings numerous questions were raised regarding the potential impact of traffic and parking on downtown Sacramento. The City was also questioned regarding the lack of specific mitigation measures to alleviate the impact of parking. The City responded that it was too soon in the design process of the center to make specific recommendations.

Following the meetings, on October 4, 1988, the City certified the EIR as complete and in compliance with CEQA. The City also adopted a motion of intent to select the east alternative to the proposed center expansion (including the office tower). The east alternative necessitated the removal or destruction of the Merrium Apartments, a priority structure on Sacramento's official register of historic properties. The City held a hearing on the feasibility of retaining the Merrium Apartments. The City determined that, in order to achieve the contiguous square footage required for the needed expansion of the center's exhibit hall, the Merrium could not remain in its present location. The City adopted a requirement of replacement housing as a condition of approval of the expansion of the center.

On October 25, 1988, by a five-to-four vote, the City certified the EIR and formally approved the east alternative. The City also adopted findings of fact and a statement of overriding considerations.

In its findings the City found that, should the relocation of the Merrium prove to be infeasible, the adverse impact of the loss of the Merrium was overridden by the benefits of the expansion of the project. In addition, the findings required the City to explore the possibility of relocating the Merrium. However, a feasibility study commissioned by the City concluded moving the Merrium was not feasible because of the weight, width and depth of the structure. Subsequently, the City issued a finding stating moving the Merrium was not feasible, and reaffirming its statement of overriding considerations for the loss of the Merrium.

Plaintiffs petitioned for a writ of mandamus in Sacramento Superior Court, to which City and Benvenuti, developer of the office tower, filed an opposition. Following a two-day bench trial, the court denied the writ. The court's minute order states: "The Court took the above matter under submission following oral arguments by the attorneys for the parties. The Court has given the matter careful consideration. In the view of the Court, the City of Sacramento substantially complied with the California Environmental Quality Act (CEQA) when it certified the final environmental impact report (EIR) for the Sacramento Community Center expansion and the 1325 J Street office towers. Therefore, the Petition for Writ of Mandamus and Complaint for Declaratory and Injunctive Relief is denied."[3]

Plaintiffs filed a notice of appeal, following the entry of judgment.[4]

I. *Compliance With CEQA*

Plaintiffs' appeal attacks the validity and sufficiency of the EIR with respect to its treatment of mitigation of impacts and analysis of cumulative impacts. The impacts plaintiffs focus on are the problems associated with parking and traffic.

A. *Standard of Review*

■ When plaintiffs challenge CEQA decisions, reviewing courts generally will defer to the agency's substantive judgments while requiring strict compliance with procedures required by law. Courts must not overturn an agency's discretionary decisions and substitute their own opinions as to what constitutes wise public policy. (*El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480].) "The court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document." (*County of Inyo* v. *City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)

---

[3] Plaintiffs filed a petition for writ of mandamus with this court, which was also denied.

[4] Subsequently, SOCA requested this court to take judicial notice of the placement of the Merrium Apartments on the National Register of Historic Places, and of the City's vote to approve demolition of the Merrium. We deny SOCA's request. We note SOCA previously sought a stay pending appeal, alleging irreparable harm, which we denied. Moreover, the placement of the Merrium on the National Register does not change the facts before us. As noted in the letter from the State Historic Preservation Office, attached to SOCA's letter, demolition of historically designated properties "may require review under local ordinances or under the California Environmental Quality Act."

Following this request, SOCA filed a petition for writ of supersedeas with this court, which we denied. SOCA then filed a request for an emergency stay in the California Supreme Court, which the Supreme Court granted.

Two CEQA provisions, Public Resources Code sections 21168 and 21168.5 govern the standard of review applied by courts in CEQA actions. The Supreme Court in *Laurel Heights* noted the standard of review under both sections is essentially the same: "[W]hether substantial evidence supports the agency's determination." (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, at fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278], citation omitted, hereafter *Laurel Heights*.) The Supreme Court went on to state: "A court may not set aside an agency's approval of an EIR on the ground that an opposite conclusion would have been equally or more reasonable. A court's task is not to weigh conflicting evidence and determine who has the better argument when the dispute is whether adverse effects have been mitigated or could be better mitigated. We have neither the resources nor scientific expertise to engage in such analysis, even if the statutorily prescribed standard of review permitted us to do so. Our limited function is consistent with the principle that 'The purpose of CEQA is not to generate paper, but to compel government at all levels to make decisions with environmental consequences in mind. CEQA does not, indeed cannot, guarantee that these decisions will always be those which favor environmental considerations.'" (*Id.* at p. 393, citations omitted.)

In applying the substantial evidence standard, the reviewing court must resolve reasonable doubt in favor of the administrative finding and decision. Substantial evidence consists of enough relevant information and reasonable inferences from this information that a fair argument can be made to support the agency's conclusion, even though other conclusions might also be reached. (*Laurel Heights, supra,* 47 Cal.3d at pp. 392-393.)

B. *Mitigation of Parking and Traffic Impacts*

Plaintiffs argue the City's EIR is defective because it fails to properly analyze or adequately mitigate the potential environmental effects of the parking necessitated by the project.

1. *Impacts Discussed in the EIR*

Before we address the specifics of plaintiffs' contention, we review the parking impacts discussed in the EIR. In preparation for the EIR, the City analyzed the number of vehicle trips and parking impacts the various center expansion alternatives would generate. For each alternative, the City used a hypothetical "worst case" scenario based on the assumption that all expanded convention center facilities were programmed to be utilized on the

same day, at the same time. This scenario assumed all the center's facilities would be in use at 2 p.m. on a weekday.[5]

The EIR found that, under the worst case scenario, every available parking space, both public and private within a three-block radius would be occupied. In addition, even with full occupancy of available spaces, an additional 1,760 parking spaces would be needed. Further, the project would eliminate 200 existing parking spaces, bringing the spaces required to a total of 1,960.

When the impacts of the 1215 K Street office tower (227 parking spaces needed) and the 1325 J Street office tower (434 parking spaces needed) were added, the total rose to 2,621 needed spaces.

In summary, under the worst case scenario, the vehicles generated by the full use of the expanded convention center and two office towers would fill all the available parking spaces within three blocks, and parking spaces would still be needed for 2,621 cars.

In the draft EIR, which considered the various expansion proposals, the City summarized in detail the parking impacts under each proposal. In addition, the City prepared tables outlining: the number of trips expansion of the convention center and construction of the office towers would generate; a comparison of the number of trips generated by the existing center and by an expanded center; and a graph summarizing parking impacts.

### 2. *Mitigation Measures in the EIR*

The City's draft EIR discussed ways of mitigating the impact of parking. The draft EIR outlined mitigation measures for each of the proposals, as well as mitigation measures for the cumulative effects of the office towers and center.

Because the proposed traffic and parking mitigation measures for the subsequently adopted east alternative are the primary focus of plaintiffs' appeal, we reproduce them in full:

"*Mitigation Measures* [¶] The following measure is required by the City to offset potential traffic impacts:

"The City will require preparation of a Transportation Management Plan (TMP) to reduce project-related traffic and parking impacts.

---

[5] The City determined the potential for the worst case scenario would occur at most three to five times per year, if ever.

"The following additional measures are recommended by the Consultant and should be considered as part of an overall program to reduce area parking utilization to less than 90 percent occupancy:

"*Parking*. Mitigation measures to reduce projected parking impacts have been developed with the overall goal being an overall area parking utilization rate of 90 percent during the critical weekday afternoon period. Potential mitigations include satellite parking facilities, and program controls to reduce parking demands. Specific potential mitigations are described as follows:

"a. Limit the Size of 'Short-Term' Weekday Events. A significant amount of the projected parking impact is the result of assumed attendance at secondary 'short-term' events, such as state exams or seminars. The worst-case analysis assumes 1,735 persons attend such an event. Restricting the size of these secondary events when a public show or convention is being held would reduce parking impacts.

"b. Promote Regional/National Conventions. This analysis has assumed that a locally-oriented convention, such as has occurred in the past, would occur. Such conventions or conferences which draw from the local area population also feature high private automobile usage. Regional/national conventions, with greater emphasis on airplane travel and downtown hotel accommodations, would create less impact, and promoting and booking such events would reduce parking demands. To promote regional/national conventions, additional downtown hotel space would probably have to be provided.

"c. Provide Satellite Parking. Area parking impacts could be reduced if event attendees parked elsewhere and walked or were shuttled to the Convention Center. Satellite parking locations would have to be readily identifiable to patrons and shuttle service would have to be timely and convenient. Implementation of this mitigation is complicated by the need to locate a source of available parking during the critical weekday afternoon hours. This parking would have to be located outside the study area and would have to be designated for Convention Center attendees. Use of light rail parking areas for satellite parking might be considered if sufficient parking capacity could be provided and enought [*sic*] light rail seats are available.

"d. Promote Alternative Transportation Modes for Attendees. The use of existing RT Metro and Bus service by event attendees should be promoted through advertising, passes or subsidies.

"e. Restrict Event Schedules. Large locally-oriented conventions or conferences could be restricted to evenings and weekends when the area parking supply may more adequately meet projected demands. Such inc[e]ntives are already provided for many public downtown events (i.e., jazz festival) where parking is at a premium.

"f. Promote Alternative Transportation Modes for Existing Area Employees and Visitors. Additional parking could be made available if downtown employees or visitors, now driving private automobiles, were encouraged to carpool or to use transit service. Designating existing parking for pools, increasing parking rates or subsidizing transit utilization are potential measures to reduce current parking demands.

"g. Construct Additional Parking. Impacts to area parking conditions could be partially mitigated by redesigning the project to provide on-site parking or by constructing additional parking in the study area which would be designated for Convention Center attendees. The *Downtown Sacramento Parking Study* (Wilbur Smith Associates 1/88) notes a proposal to expand Lot E (12th & I) to provide 381 spaces, and describes the East End Garage (1,058 spaces on I Street between 10th and 11th). Both projects would be available to the general public but could be designated for Convention Center use in order to accommodate large concurrent events. The study also describes development of a Lot C structure, which could provide a net increase of 733 spaces on H Street between 14th and 15th Street. In addition, the recently completed Hyatt Regency Ho[t]el is intended to provide some public parking. This additional parking was not included in the demand analysis. To mitigate project parking demands, the overall level of parking utilization in the study area should not exceed 90 percent. Table 4-25 provides a schedule for calculation of variable mitigations which would achieve this level of utilization. Use of this schedule is described in detail under cumulative conditions, and an example application is presented in Appendix C."

After circulation of the draft EIR, during a series of public meetings, the City was bombarded by questions concerning, among other issues, the impact of parking in downtown Sacramento. SOCA questioned some of the parking mitigation alternatives. The Department of Public Works and the Department of Transportation commented on parking mitigation measures. In response, the City outlined, discussed and attempted to clarify the various mitigation measures. In addition, written comments concerning parking were solicited, discussed and ultimately included in the EIR.

On appeal, plaintiffs argue the EIR's consideration of parking impacts fails to comply with the requirements of CEQA. Plaintiffs phrase this

argument in three different ways: (1) the City has treated parking as a separate, independent future project, rather than a necessary component of the current project, thereby improperly segmenting the project; (2) the City's discussion of parking mitigation measures is inadequate and incomplete; and (3) by deferring the discussion of specific mitigation measures, the City fails to properly evaluate the cumulative effects of the project.

### 3. *Improper Segmentation of the EIR*

■ Initially, plaintiffs argue the lack of specificity in the parking mitigation measures discussed in the EIR amounts to an illegal segmentation of the project. According to plaintiffs' reasoning, by deferring the complete review of parking problems until an undetermined future date, the City has illegally truncated the proposed project and treated parking impacts as a separate independent project.

As plaintiffs point out, the heart of the EIR process is an accurate description in the EIR of the proposed project. "A curtailed or distorted project description may stultify the objectives of the reporting process. Only through an accurate view of the project may affected outsiders and public decision-makers balance the proposal's benefit against its environmental cost, consider mitigation measures, assess the advantage of terminating the proposal . . . and weigh other alternatives in the balance. An accurate, stable and finite project description is the *sine qua non* of an informative and legally sufficient EIR." (*Inyo County* v. *City of Los Angeles, supra*, 71 Cal.App.3d at pp. 192-193.)

Plaintiffs argue specific, detailed provisions for necessary parking fall within the project's scope, and must be included in the EIR. In support, plaintiffs cite *Laurel Heights, supra,* 47 Cal.3d at page 376. In order to address plaintiffs' concerns a detailed discussion of *Laurel Heights* is necessary. In *Laurel Heights* a citizens association challenged the University of California's (University) certification of an EIR for the expansion of the pharmacy school's biomedical research operations, and the creation of a new facility in a residential neighborhood.

One of the plaintiff's contentions centered on the scope of the University's EIR. Plaintiff argued the EIR did not accurately assess the project's reasonably foreseeable impacts, because the analysis ignored the fact the University intended to expand the research facility within a few years after opening it. (47 Cal.3d at pp. 393-394.)[6] The EIR omitted *any* discussion of

---

[6]The proposed initial research facility would occupy 100,000 square feet in a residential neighborhood. The operations would then be expanded, perhaps within 3 years to include the full 354,000 available square feet. (47 Cal.3d at p. 393.)

the impacts of the project in its probable ultimate expanded form. The University argued it need not evaluate the effects of future use of the site, because it had not yet formally approved any expansion of the facility. (*Id.* at p. 394.)

The Supreme Court agreed with plaintiff and held that the EIR should have addressed anticipated future uses of the site and their environmental effects. The court also found that "a public agency's approval of a project or future portions of a project is not a prerequisite for an environmental impact report under CEQA." (47 Cal.3d at p. 395, fn. omitted.)

The court went on to explain: "The more important and difficult question is what circumstances require consideration in an EIR of future action related to the proposed project. A basic tenet of CEQA is that an environmental analysis should be prepared as early as feasible in the planning process to enable environmental considerations to influence project program and design and yet late enough to provide meaningful information for environmental assessment. The [University] Regents correctly note that where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences. We agree that environmental resources and the public fisc may be ill served if the environmental review is too early. On the other hand, the later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project. This problem may be exacerbated where, as here, the public agency prepares *and* approves the EIR for its own project. For that reason, EIRs should be prepared as early in the planning process as possible to enable environmental considerations to influence project, program or design." (47 Cal.3d at p. 395, citations omitted, internal quotation marks omitted.)

The court then considered how to balance these competing concerns stating: "We hold that an EIR must include any analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA. [¶] This standard is consistent with the principle that 'environmental considerations do not become submerged by chopping a large project into many little ones—each with a minimal

potential impact on the environment—which cumulatively may have disastrous consequences.' The standard also gives due deference to the fact that premature environmental analysis may be meaningless and financially wasteful. Under this standard, *the facts of each case will determine whether and to what extent an EIR must analyze future expansion or other action.*" (47 Cal.3d at p. 396, citation omitted, italics added.) The court found the University's expansion was reasonably foreseeable and would change the scope of the intial project. (*Id.* at p. 398.)

Plaintiffs in the present case contend the facts before us concerning parking compel the same conclusion. According to plaintiffs, provision of necessary parking for the expansion of the center was reasonably foreseeable and provision for adequate parking "by any method would be a major undertaking that would of necessity greatly expand the scope and nature of the initial project's environmental consequences beyond the effects of the building of the expansion and office towers alone."

We must disagree with plaintiffs' analysis of the facts of this case. We agree the necessity for adequate parking is reasonably foreseeable given the worst case scenario of 2,621 automobiles searching for parking in downtown Sacramento. In response to this foreseeable impact, the City provided a list of seven "specific potential mitigation" measures ranging from limiting the size of weekday events to constructing additional parking.

However, unlike the situation in *Laurel Heights* where the University *knew* it would be expanding in the immediate future, and knew *exactly* how many square feet the expansion would be, the City in this case knows only that it will have to mitigate parking, probably by implementing some or all of the potential mitigation measures listed in the EIR. These potential mitigation measures may, *in certain combinations* greatly expand the scope and nature of the project's environmental consequences. However, until these specific measures are adopted and more fully fleshed out, their effects remain abstract and speculative.

This was not the case in *Laurel Heights* where the record revealed the University had already decided on expanding the project to twice its original size.[7] Nothing in the record before us shows the City had already

[7] In *Laurel Heights* the court considered a myriad of facts which revealed the proposed expansion was a reasonably foreseeable and environmentally significant consequence of the initial project. The draft EIR submitted by the University acknowledged the University would expand as soon as land became available, and estimated the number of staff needed to run the expanded facility. (47 Cal.3d at p. 396.) The University's final EIR contained references to the future expansion as a future certainty. (*Id.* at p. 397.) In addition, the record contained private correspondence referring to the University's plan to occupy the 350,000 square feet. (*Id.* at p. 397.) The court concluded, "In short, there is telling evidence that the University,

decided, at the time of the EIR, on any *one* mitigation measure (for example the construction of a parking structure) which would be a "future expansion or action . . . significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights, supra,* 47 Cal.3d at p. 396.) Therefore, we do not find the City, by considering a list of seven parking mitigation measures, impermissibly segmented the project.[8]

### 4. *Adequacy of Mitigation Measures*

██ Plaintiffs argue the EIR is defective because the City failed to describe and examine "true" mitigation measures and failed to analyze the potential environmental impacts of implementing such measures. Plaintiffs contend the EIR provides no specific mitigation measures for the parking impacts, but instead offers a list of "seven general measures of the sort that *might* be included in [the City's] *unformulated* 'Transportation Management Plan.'" This, according to plaintiffs, is not enough to satisfy CEQA.

---

by the time it prepared the EIR, had either made decisions or formulated reasonably definite proposals as to future uses of the building. At a minimum, it is clear that the future expansion and the general types of future activity at the facility are reasonably foreseeable." (*Id.* at p. 397.) The court also found the future expansion of the project would change the scope and nature of the initial project and its environmental effects. (*Id.* at p. 398.)

[8] Plaintiffs also direct our attention to the holding in *Christward Ministry* v. *Superior Court* (1986) 184 Cal.App.3d 180 [228 Cal.Rptr. 868]. In *Christward* plaintiffs challenged an EIR contending it impermissibly segmented the proposed project into several discrete projects: a general plan amendment, a trash-to-energy resource recovery project and a methane extraction project. (*Id.* at p. 195.) The appellate court rejected the EIR characterizing it as "exactly the type of piecemeal environmental review prohibited by CEQA." (*Id.* at p. 195.) The court in *Christward* concluded, "to allow the resource recovery project approval to stand would be to sanction piecemeal environmental review, allowing one aspect of a project to be approved before the environmental consequences of the larger project are reviewed." (*Id.* at p. 196.) We do not find the proposed parking mitigation measures in the present case to constitute a discrete project separate from the center expansion. Nor do we find the City's EIR, which includes the mitigation measures, to be a "piecemeal" review.

In oral argument SOCA relied upon *Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692 [270 Cal.Rptr. 650] as further proof the City has impermissibly segmented the convention center project. In *Kings County* an EIR on a proposed cogeneration plant divided the resulting emissions into two categories: on-site emissions, which result from fuel and material handling as well as fuel combustion; and secondary emissions, which result from employee traffic, delivery truck traffic, train delivery of coal and coal handling facilities. (*Id.* at p. 714.) Each category was found to not, individually, constitute an environmentally significant impact. The court found this division an effort to circumvent CEQA by chopping up the project into bite-size pieces. (*Id.* at p. 716.) The court noted: "The project *requires* the delivery of coal for fuel. The resulting emissions from truck or train traffic are related to the project and cannot be ignored when determining whether air emissions meet existing standards for purposes of invoking the presumption of no significant impact." (*Id.* at pp. 716-717, italics added.) In *Kings County* no alternatives to truck delivery were either contemplated or discussed, truck delivery and its subsequent emissions were *required* by the project. That is not the case in the situation presented here. The City *has* proposed several alternatives to a parking structure; therefore we find the City has not segmented the project.

Public Resources Code section 21002 requires agencies to adopt feasible mitigation measures to substantially lessen or avoid otherwise significant adverse environmental impacts.

The CEQA guidelines state that to be legally adequate mitigation measures must be capable of: "(a) Avoiding the impact altogether by not taking a certain action or parts of an action. (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action." (Cal. Code Regs., tit.14, § 15370.)[9]

For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated. If the inclusion of a mitigation measure would itself create new significant effects, these too, must be discussed, though in less detail than required for those caused by the project itself. (Guidelines, § 15126, subd. (c); see also *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986, 995-996 [178 Cal.Rptr. 367].)

For projects for which an EIR has been prepared, where substantial evidence supports the approving agency's conclusion that mitigation measures will be effective, courts will uphold such measures against attacks based on their alleged inadequacy. (*Laurel Heights, supra,* 47 Cal.3d at p. 407.)

Plaintiffs compare the situation in the present case to the situation in *Sundstrom* v. *County of Mendocino* (1988) 202 Cal.App.3d 296 [248 Cal.Rptr. 352]. In *Sundstrom*, the appellate court set aside a county's approval of a conditional use permit authorizing construction of a sewage treatment plant to serve an existing development. The court found the county had violated CEQA by approving the project based on a negative declaration without first resolving uncertainties regarding the project's potential to cause significant environmental impacts. (*Id.* at pp. 307-308.)

---

[9] In 1973, pursuant to authority granted in the Public Resources Code section 21083, the California Resources Agency issued the first set of CEQA guidelines (Guidelines, Cal. Code Regs., tit. 14, § 15000 et seq). These guidelines embody the statutory mandates of CEQA and the subsequent case law interpreting CEQA. The procedures adopted by public agencies to implement CEQA must be consistent with the guidelines. (Pub. Resources Code, § 21082.) The Supreme Court has not yet determined whether the guidelines are regulatory mandates or only aids to interpreting CEQA. However, in *Laurel Heights, supra,* 47 Cal.3d at page 391, footnote 2 the court directed agencies to "afford [them] great weight . . . except when a provision is clearly unauthorized or erroneous."

Among the conditions of approval were directions to the project applicant to develop and implement concrete mitigation measures *after* project approval. The applicant was to prepare a hydrological study evaluating the project's potential environmental effects and proposing any necessary mitigation measures. The appellate court concluded because the success of mitigation was uncertain, the county could not have reasonably determined that significant effects would not occur. This deferral of environmental assessment until after project approval violated CEQA's policy that impacts must be identified before project momentum reduces or eliminates the agency's flexibility to subsequently change its course of action.[10]

Although plaintiffs contend the lack of specific parking mitigation in the present case mirrors the situation in *Sundstrom* and compels a similar result, we note several distinct differences between the two cases. First, *Sundstrom* involved a negative declaration. A negative declaration must be prepared when an agency determines, after preparing an initial study, that a project "does not have a significant effect on the environment." Such a determination can be made only if "[t]here is no substantial evidence before the agency" that such impacts may occur. (Pub. Resources Code, § 21080, subd. (c); Guidelines, § 15070, subd. (a).) In other words, in *Sundstrom* the county had determined, before the required studies were even performed, that the project would not have a significant impact on the environment. In contrast, the City in the present case acknowledged traffic and parking have the potential, particularly under the worst case scenario, of causing serious environmental problems. The City did not minimize or ignore the impacts in reliance on some future parking study.

Moreover, the county in *Sundstrom* approved the project without considering or addressing *any* mitigation measures. In the present case, the City has set forth a list of alternatives to be considered in the formulation of a transportation management plan, a plan the City itself, not the developer, will prepare.

As one commentator has opined, *Sundstrom* "need not be understood to prevent project approval in situations in which the formulation of precise means of mitigating impacts is truly infeasible or impractical at the time of project approval. In such cases, the approving agency should commit itself to eventually working out such measures as can be feasibly devised, but should treat the impacts in question as being significant at the time of project approval. Alternatively, for kinds of impacts for which mitigation is

---

[10] In addition, because the permit authorized the applicant himself, subject to planning staff approval, to conduct the required studies, the county violated CEQA's requirement that all environmental analysis must ultimately derive from the decisionmaking body itself. (202 Cal.App.3d at pp. 308-309.)

known to be feasible, but where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. Where future action to carry a project forward is contingent on devising means to satisfy such criteria, the agency should be able to rely on its commitment as evidence that significant impacts will in fact be mitigated. (*See Laurel Heights, supra,* 47 Cal.3d at 418 [253 Cal.Rptr. 426, 448] [upholds mitigation measure by which project noise levels will be kept within performance standards]; and *Schaeffer Land Trust* v. *San Jose City Council* (6th Dist. 1989) 215 Cal.App.3d 612, 632 [263 Cal.Rptr. 813, 819] [upholds approval of general plan amendment based on a negative declaration because actual physical development will be contingent on devising plan to ensure compliance with city standards for traffic levels of service].)" (Remy et al., Guide to the Cal. Environmental Quality Act (1991 ed.) pp. 200-201, fn. omitted.)

The City in the present case has, in fact, committed itself to mitigating the impacts of parking and traffic. The City approved funds for a major study of downtown transportation.

The draft EIR discussed several options for mitigating the parking problem. The EIR section on mitigation noted: "Impacts to area parking conditions could be partially mitigated by redesigning the project to provide on-site parking or by constructing additional parking in the study area which would be designated for Convention Center attendees. The *Downtown Sacramento Parking Study* (Wilbur Smith Associates 1/88) notes a proposal to expand Lot E (12th & I) to provide 381 spaces, and describes the East End Garage (1,058 spaces on I Street between 10th and 11th). Both projects would be available to the general public but could be designated for Convention Center use in order to accommodate large concurrent events. The study also describes development of a Lot C structure, which could provide a net increase of 733 spaces on H Street between 14th and 15th Street. In addition, the recently completed Hyatt Regency Ho[t]el is intended to provide some public parking. This additional parking was not included in the demand analysis."

The City, in its brief, points out how in *Laurel Heights* the Supreme Court held a list of parking mitigation options sufficient to satisfy the requirements of CEQA. In *Laurel Heights* the University's EIR found that relocation of the research facilities would not appreciably increase traffic. The court went on to note: "The discussion [in the EIR] of parking also fails to show any significant defects. UCSF [the University] estimated that without mitigation measures 507 on-site parking spaces will be available.

After mitigation measures (new spaces and restriping), there will be 547 spaces. UCSF estimated a need for 576 on-site spaces and acknowledged a deficit of 29 spaces. To eliminate this deficit, UCSF promised 'to promote ongoing campus transportation systems, management programs, including promotion of transit, carpooling, vanpooling, and related activities. . . .' On these facts, we believe the discussion of mitigation was adequate." (*Laurel Heights, supra,* 47 Cal.3d at p. 418.)

While we agree with plaintiffs' observation that the 29 parking space deficit in *Laurel Heights* is far less egregious than the deficit of 2,621 parking spaces in the present case, we also find the alternatives proposed as a means of mitigating this deficit are far more extensive than those found sufficient in *Laurel Heights.* In the present case, the EIR offered seven distinct types of alternatives to be studied, analyzed and possibly incorporated into a transportation management program. The range of alternatives includes scheduling changes for the expanded center's activities, satellite parking locations; public transit, carpooling; and construction of new parking or expanded use of existing parking. Given the facts of the case before us, we find the trial court did not err in finding these proposed mitigation measures satisifed CEQA.

### 5. *Cumulative Effects of Mitigation Measures*

■ Plaintiffs argue the convention center expansion will generate significant mitigation measures, which will, in turn, create new and significant environmental effects. Plaintiffs contend the EIR fails to adequately discuss these mitigation impacts, and therefore the EIR violates CEQA.

A draft EIR must discuss cumulative impacts when they are significant. (Guidelines, § 15130, subd. (a).) Cumulative impacts are defined as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." (Guidelines, § 15355.)

According to plaintiffs, "it is clear that significant measures will have to be taken in order to accommodate the over-2,600-space parking deficit that the project would generate in the heart of downtown Sacramento. Because any such measures—whether the construction of new downtown parking lots, the erection of a large parking garage or the shuttling of hundreds of people from unspecified outlying parking areas—are likely to create substantial additional adverse environmental effects" these cumulative effects must by analyzed in the EIR.

In effect, plaintiffs contend the EIR must include a discussion of the cumulative effects of projects which have not yet been approved. This

contention conflicts with the Supreme Court decision in *Laurel Heights*. In *Laurel Heights* the court noted, "prophecy" is not required in an EIR. "Nor do we require discussion in the EIR of specific future action that is merely contemplated or a gleam in the planner's eye. To do so would be inconsistent with the rule that mere feasibility and planning studies do not require an EIR. A detailed environmental analysis of every precise use that may conceivably occur is not necessary at this stage." (*Laurel Heights, supra,* 47 Cal.3d at p. 398, citations omitted.)[11]

In a similar case, *Towards Responsibility in Planning (TRIP)* v. *City Council* (1988) 200 Cal.App.3d 671 [246 Cal.Rptr. 317], *TRIP*, a citizen's group, challenged an EIR contending the industrial development of an agricultural area would precipitate the need for a sewage treatment plant. *TRIP* argued the EIR did not adequately discuss the environmental costs and benefits of the treatment plant and contended the City had to wait until the five-year study on the plant was completed before the EIR could be adopted. (*Id*. at p. 676.)

The court disagreed, finding, "Adoption of an EIR need not be interminably delayed to include results of works in progress which might shed some additional light on the subject. The sufficiency of an EIR as an informative document is judged 'in light of what is reasonably feasible.' [¶] We are satisifed that the EIR was sufficiently detailed in its discussion of the effect of the proposed projects on water quality. It is unnecessary in an EIR to engage in sheer speculation as to future environmental consequences. It would be unreasonable to expect this EIR to produce detailed information about the environmental impacts of a future regional facility whose scope is uncertain and which will in any case be subject to its own environmental review." (200 Cal.App.3d at p. 681, citations omitted.)

In *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223 [242 Cal.Rptr. 37], the appellate court considered plaintiffs' challenge of an EIR on the drilling of exploratory wells and development of transport pipelines. Plaintiffs argued the EIR's discussion of pipeline routes was inadequate. The court found the EIR to be adequate, holding that the lack of detail on proposed pipeline routes did not violate CEQA. The EIR identified the planned pipeline's ultimate destinations, but did not explore either all the

---

[11] In *Laurel Heights* the court found the University's EIR deficient in that it failed to discuss "in at least general terms" the general effects of future expansion of a research facility. (*Laurel Heights, supra,* 47 Cal.3d at p. 398.) Again we note the record in *Laurel Heights* was replete with evidence the University knew, at the time it formulated the EIR, that the expansion of the facility would take place. Moreover, the University knew the square footage and location of the explansion. (*Id*. at pp. 396-397.) Here the mitigation alternatives consist of seven different options—a far cry from one definite structure the court considered in *Laurel Heights*.

potential routes that could be used to reach them or the specific impacts that would result under each route. (*Id.* at pp. 234-237.) The court found, "the EIR adequately informed City Council of the environmental risks associated with the entire project including the pipeline. A detailed environmental analysis of each potential route the pipeline might take was not necessary at this stage." (*Id.* at pp. 237-238.)[12]

In the present case, we find unreasonable plaintiffs' contention that the EIR is unsatisfactory because of its failure to consider the possible cumulative impacts stemming from the seven proposed mitigation measures. As the Guidelines point out, "Drafting an EIR . . . involves some degree of forecasting. While foreseeing the unforeseeable is not possible, an agency must use its best efforts to find out and disclose all it reasonably can." (Guidelines, § 15144.) We find the City has met this test of reasonableness in regards to the mitigation measures proposed in the EIR.[13]

## C. *EIR's Analysis of Cumulative Impacts*

■ Plaintiffs contend the City has failed to adequately address the *cumulative* parking and traffic impacts.[14] In particular plaintiffs focus on the

---

[12] Plaintiffs argue *No Oil* "may be of questionable continuing validity in light of *Laurel Heights*." However, we find the situation in *Laurel Heights*, where the University *knew* exactly where it would expand, different from the facts of *No Oil*. In *No Oil* the record revealed the project proponent *did not* know which pipelines, if any, would be needed to transport oil. (*No Oil, supra,* 196 Cal.App.3d 223, 237.) We further note the citation by *Laurel Heights*, with approval, of *No Oil* at 47 Cal.3d 398.

[13] The City had authorized a subsequent EIR (referred to for convenience as SEIR) but it had not been completed and certified and was only in draft outline form at the time of the hearing below. That draft provides a list of parking alternatives for the center expansion, and delineates parking spaces for each parking alternative. Underground parking below the expanded center itself would create 600 spaces. The east end garage would provide 652 spaces; expansion of the lot E garage 400 spaces; expansion of lots C and E 647 spaces. In addition, a satellite lot at a light rail station would provide 1,300 spaces. These alternatives would provide 4,216 available spaces to meet the projected need for 2,621 spaces.

The trial court considered this postdecision material in the administrative record over plaintiffs' objection. However, under Code of Civil Procedure section 1094.5, courts can only review evidence that was actually before the administrative decision makers prior to or at the time of their decision. (*Browning-Ferris Industries* v. *City Council* (1986) 181 Cal.App.3d 852, 861 [226 Cal.Rptr. 575].) The City's assertion, at oral argument, that the draft outline was properly considered by the trial court under *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161] is not supported by that case because a proposed draft which has not been finalized and adopted cannot be considered part of the administrative record before us. We find the trial court's error in admitting this evidence to be harmless, since we find sufficient evidence in the administrative record itself to support the City's approval of the EIR. (See *Merz* v. *Board of Supervisors* (1983) 147 Cal.App.3d 933, 937 [195 Cal.Rptr. 370].)

[14] In their opening brief, plaintiffs in this section on cumulative impacts again raise the issue of the cumulative effect of mitigation measures. This issue is discussed in the preceding section.

project's cumulative impacts on freeway interchange traffic, and argue the EIR's examination of these impacts is inadequate.

In support of this assertion, plaintiffs cite a written comment by California Department of Transportation (CALTRANS) which stated, in part: "Caltrans is concerned that this draft EIR, as with other documents prepared for the downtown area, does not address impacts to state facilities. We are particularly concerned about impacts to ramps on Business 80 and Interstate 5 during peak hours . . . . We request the final EIR address the above concerns." In addition, the plaintiffs point out the State Department of General Services also requested that the City analyze the impact of center expansion on freeway interchanges. Despite these comments, plaintiffs argue, the City refused to do any additional analysis.

The City included these written comments in the EIR. The EIR also includes an analysis of the cumulative traffic impacts caused by expanding the existing center. This analysis considers the increase in traffic in downtown Sacramento as well as on nearby freeway interchanges. The study concludes the additional traffic would *not* cause the "level of service" at the intersections and onramps to fall below "Level C." As the EIR states, in part: "City of Sacramento utilizes Level-of-Service 'C' as an operational level beyond which mitigations are required to improve intersection performance . . . . Projected intersection performance would vary at each location depending upon the development alternative . . . . This is especially true at intersections immediately adjacent to proposed individual access locations. However, traffic volumes generated from the operation of an expanded Convention Center would allow satisfactory intersection operation at all locations. AM and PM peak hour Levels-of-Service are projected to be satisfactory for the East Alternative and all other Convention Center alternatives when projected Convention Center volumes are added to existing traffic conditions."

Given the record before us, we find the City adequately discussed the cumulative traffic impact of the project on surrounding roads and intersections. The EIR takes into consideration the severity of the traffic impacts, and the likelihood of their occurrence. As the Guidelines instruct, "the discussion [of cumulative impacts] should be guided by the standards of practicality and reasonableness." (Guidelines, § 15130, subd. (b).) Moreover, apropos of the comments by CALTRANS and the Department of General Services, as the Supreme Court in *Laurel Heights* noted: "A project opponent or reviewing court can always imagine some additional study or analysis that might provide helpful information. It is not for them to design the EIR." (*Laurel Heights, supra,* 47 Cal.3d at p. 415.)

### D. *Sufficiency of the Findings*

Plaintiffs challenge the sufficiency of the evidence in support of two of the City's findings: (1) traffic and parking impacts will be mitigated to a level of insignificance; and (2) loss of the Merrium Apartments will be mitigated.

■ An agency cannot fulfill its CEQA duties simply by considering the EIR before approving the project. (*Burger* v. *County of Mendocino* (1975) 45 Cal.App.3d 322, 326 [119 Cal.Rptr. 568].) If the agency decides to approve a project despite its significant adverse impacts, the agency must issue findings which specifically state how the agency has responded to the significant impacts identified in the EIR. "[T]he purpose of the statutory requirement for findings is to ensure that the decisionmaking agency actually considers mitigation measures." (*Resource Defense Fund* v. *Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 896 [236 Cal.Rptr. 794].)

For each significant effect identified in the EIR, the agency must make one or more of the following findings: (1) that changes or alterations have been required in, or incorporated into, the project that avoid or substantially lessen the effect; (2) that the lead agency lacks jurisdiction to make the change, but that another agency does have such authority; and/or (3) that specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the Final EIR. (Pub. Resources Code, § 21081.) All of these findings must be supported by substantial evidence in the admininstrative record. (Guidelines, § 15091, subd. (b).) Substantial evidence consists of enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached. (*Laurel Heights, supra,* 47 Cal.3d at pp. 392-393.)

In *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506 [113 Cal.Rptr. 836, 522 P.2d 12], the Supreme Court explained the reason for requiring detailed findings: "Among other functions, a findings requirement serves to conduce the administrative body to draw legally relevant sub-conclusions supportive of its ultimate decision; the intended effect is to facilitate orderly analysis and minimize the likelihood that the agency will randomly leap from evidence to conclusions. In addition, findings enable the reviewing court to trace and examine the agency's mode of analysis. [¶] Absent such roadsigns, a reviewing court would be forced into unguided and resource-consuming explorations; it would have to grope through the record to determine whether some combination of credible evidentiary items which supported some line of factual and legal conclusions supported the ultimate order or decision of the agency." (*Id.* at pp. 516-517, citations omitted.)

### 1. *Findings Regarding Parking and Traffic*

After approving the project, the City approved mitigation measures for parking and traffic. The City also issued the following finding:

"The City Council finds, based on substantial evidence in the record, that the following mitigation measures will reduce the above described potentially significant effects on traffic, circulation and parking, below a level of significance.

"1) The City will require preparation of a Transportation Management Plan (TMP) to reduce project related traffic and parking impacts and

"2) The City will set a goal of achieving 90 percent utilization of the available parking supply during the critical weekday afternoon period. Of the potential measures discussed in the EIR for achieving the 90 percent parking utilization rate, the Council finds that the following measures are feasible:

"-promote regional/national conventions;

"-provide satellite parking;

"-promote alternative transportation mode for attendees;

"-promote alternative transportation modes for existing area employees and visitors; and

"-construct additional parking."[15]

■ In their attack on the findings, plaintiffs reiterate their objections to sufficiency of the mitigation measures proposed by the City and argue the finding concerning parking mitigation completely lacks evidentiary support. In particular, plaintiffs argue there is no description of either the transportation management plan or the satellite lots.[16]

---

[15] The City found two measures infeasible: (1) to limit the size of "short term" weekday events; and (2) restrict event schedules. The City found these measures infeasible limitations on the size of events, and noted that restrictions on events would defeat the purpose of center expansion. The City also noted, "[o]f the five measures that are feasible to achieve the 90 percent parking utilization rate, the City will plan the specific measur[e] be utilized as more specific details on the final design of the project are developed."

[16] Plaintiffs also renew their contention that the EIR contains an insufficient discussion of the possible construction of additional parking. This contention is discussed in section IB (4), *ante.*

As the City points out in its response, at the time the community center expansion was being considered, the City was in the process of revising its transportation management ordinance to provide for more stringent mitigation requirements. Because the new ordinance was not yet in effect, the City was concerned traffic and parking impacts would not be adequately mitigated by the existing transportation ordinance. In response to this mitigation "gap," the City imposed additional requirements on office tower projects, specifically designed to mitigate downtown parking and traffic impacts not fully mitigated by the existing ordinance. At two meetings in 1988 the proposal was debated, and a list of mitigation measures required for project approval was drawn up. Included in these mitigation measures was the creation of a downtown transportation mitigation pool, requiring each project to be assessed a fee of 75 cents per square foot of office space. The fee is to be paid to the City prior to issuance of a building permit, and is to be used for the expansion and improvement of the downtown transportation system. Another mitigation measure requires applicants for building permits to file transportation management plans outlining compliance with the City's current trip reduction ordinance.

These subsequent measures, taken by the City, and reflected in the administrative record, provide substantial evidence in support of the finding that "[t]he City will require preparation of a Transportation Management Plan . . . to reduce project related traffic and parking impacts."

As for satellite parking, the City discussed a shuttle service as an alternative means of bringing patrons to the expanded center. The City considered use of existing light rail parking areas for satellite parking, noting such use was contingent on the availability of light rail seats and spaces in light rail lots. The City estimates use of satellite lots would reduce demand by 350 parking spaces.

The EIR also suggested parking and traffic impacts could be lessened through the use of advertising, passes or subsidies aimed at encouraging potential patrons to carpool or use transit services. Specifically, the EIR considered "[d]esignating existing parking for [car] pools, increasing parking rates or subsidizing transit utilization." The development scenario for the eastern expansion of the center advises promoting rapid transit use by office tenants and increasing rapid transit capacity to achieve a goal of 30 percent transit utilization by office tenants. The scenario indicates such usage would result in a reduction in parking demand by 720 spaces.

We find the EIR, in its consideration, discussion and analysis of the various proposed mitigation measures has complied with CEQA's findings requirement. Substantial evidence in the record supports the City's finding

that "[c]hanges or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report" (Pub. Resources Code, § 21081.)

We distinguish the findings in the present case from those we found insufficient in *Citizens for Quality Growth* v. *City of Mount Shasta* (1988) 198 Cal.Ap.3d 433 [243 Cal.Rptr. 727]. *Citizens for Quality Growth* involved a general plan amendment and rezone allowing the industrial and commercial use of sensitive wetlands. The city failed to issue findings regarding both mitigation measures and project alternatives. The city attempted to justify its failure to make findings on the feasibility of 21 mitigation measures set forth in the EIR by arguing that adoption of such measures would be premature until the developer had submitted a specific development plan. (*Id*. at p. 442.) We disagreed noting, "While detailed mitigation measures may not be possible before a specific development plan is proposed, general mitigation measures may be adopted and are in fact suggested in the EIR." (*Id*. at p. 442.) In the present case, the City set forth general mitigation measures regarding traffic and parking, and adopted findings regarding these mitigation measures.[17]

### 2. *Findings Regarding the Merrium Apartments*

■ Plaintiffs also contend the EIR's findings with respect to mitigation for demolition of the Merrium Apartments are legally deficient. Plaintiffs characterize the EIR's mitigation measures as "vague and conclusory" promises to remedy the impact of the loss of housing in the future.

In its findings, under the heading "Historic Preservation and Cultural Resources" the EIR states, in part: "The City Council has determined the project site selected (East Alternative) could cause the following potentially significant effects on historic preservation and cultural resources: [¶] (1) Demolition of the Merrium Apartments (a priority structure) if relocation is found to be infeasible." The City further stated as a mitigation measure, "The City will make every reasonable effort to relocate the Merrium Apartment Building to another site." The EIR went on to state: "The City Council further finds that if relocation of the Merrium Apartment building is not feasible, relocation housing will be caused to be constructed. No other

---

[17] In *Citizens for Quality Growth*, the City also argued that passing references to mitigation measures in the resolution certifying the EIR and the statement of overriding considerations constituted an "implicit finding" effectively adopting the mitigation measures. We rejected the City's argument and found such an "implicit finding" does not satisfy CEQA's requirement of express findings. (198 Cal.App.3d at pp. 441-442.)

mitigation measures suggested in the EIR are feasible due to overriding social and economic considerations [detailed in another section]."[18]

Under the heading "Housing," the EIR again acknowledged the impact of demolition of the Merrium Apartments and set forth as a mitigation measure the following: "The City will establish an aggressive program to locate appropriate replacement housing in the Central City for tenants displaced from the Merrium Apartments. The City will also cause replacement housing to be built, if the relocation of the Merrium Apartment building is found to be infeasible."

The City points out it commissioned two studies on the Merrium. The first, a study of historical structures in downtown Sacramento, was summarized in the EIR, and integrated into the cumulative impact analysis for historic structures included in the EIR.[19] The EIR also utilized this study in its discussion of comparative impacts each of the four alternative expansion proposals would have on historic structures.

The City commissioned a second study in accordance with the EIR's recommendation that the City thoroughly investigate the technical and economic feasibility of relocating the Merrium. This study, entitled the "Turner Study," concluded relocation would cost approximately $3.7 million. The study found, "Unfortunately, the combination of building to

---

[18] The EIR set forth the following mitigation measures: "The project's direct impact on the Merrium Apartment building, a Priority Structure, could be mitigated by:

"retaining the existing structure;

"retaining the facade only;

"relocating the building to another site; or

"relocating the facade to another site.

"Retention of the existing structure would not significantly reduce the Convention Center space since the apartment building sits on a relatively small parcel (80'x 80'). Of the various historical buildings on the alternative sites, the Merrium apartment building is by far the tallest and most intensively used. For this reason, it is the structure least likely to be dwarfed by new construction. Retention of the building is impractical from a space programming standpoint, however, since the Expansion needs large expanses of contiguous space. Additionally, vehicular access to the Merrium would be restricted by the Expansion and the building would be isolated from adjoining buildings.

"Retention of the facade would be impractical unless the proposed Expansion were to be at least five stories tall. As current plans call for a much shorter structure, this measure is infeasible. Relocation of the building's facade would be nearly impossible from a technical standpoint and impractical in terms of finding another structure to which it might be attached.

"Relocation of the five-story reinforced concrete building to another site may be technically infeasible. However, the City should thoroughly investigate the technical and economic feasibility of relocating the Merrium Apartments to a suitable site in the downtown area."

[19] The Merrium Apartments have been designated as a priority structure on the City's official register. This register recognizes two levels of historic significance of structures: essential and priority. Essential structures are considered irreplaceable; priority structures are considered significant, but may be removed under unusual and compelling circumstances.

building clearances, safety factors, existing underground vaults, and the presence of 'non-removable' trees prohibit any relocation off its current block in one section." The study considered consulting reports from a structural engineer, a building mover specialist, a building code specialist, a soils engineer, a toxic materials specialist, and a building construction specialist. Ultimately the study concluded relocation of the building in two sections was not feasible due to the significantly high stresses such a relocation would put on the structure.

The City also took further steps to mitigate the loss of the Merrium's 41 apartment units. The EIR recommended the following mitigation measures to alleviate the impact on downtown Sacramento housing: (1) establish an aggressive program to locate appropriate replacement housing for the Merrium's displaced tenants; (2) provide monetary relocation benefits for displaced tenants ($500 for fixed moving costs, with possible reimbursement for reasonable higher moving costs and compensation for rent differential up to $4,000 or 25 percent of the individual's income).

To address the first mitigation measure, the City adopted a requirement of replacement housing in downtown Sacramento as a condition for approval of the center expansion. Subsequently, the City approved a replacement housing project, located two blocks from the Merrium. This project adds 51 units to the area. At the same time, the City moved to contract with the Sacramento Housing and Redevelopment Agency to provide a budget of $400,000 for relocation assistance for Merrium tenants. The City also passed a resolution to purchase the Merrium for $1.3 million.

Our review of the record before us reveals the mitigation measures and the findings concerning the loss of the Merrium are both adequate under the requirements of CEQA and are supported by substantial evidence in the record. As our Supreme Court recently summarized "The wisdom of approving this or any development project, a delicate task which requires a balancing of interests, is necessarily left to the sound discretion of the local officials and their constituents who are responsible for such decisions. The law as we interpret and apply it simply requires that those decisions be informed, and therefore balanced. Concurrently, we caution that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley* v. *Board of Supervisors, supra*, 52 Cal.3d at p. 576.)

### DISPOSITION

The judgment is affirmed. Defendants to recover costs on appeal.

Puglia, P. J., concurred.

**SIMS, J.**—I respectfully dissent.

There is no substantial evidence showing that parking needs, which will be inexorably generated by the massive convention center project, can be mitigated without construction of additional parking facilities. Therefore, construction of additional parking facilities is a direct, inevitable effect of the project, a conclusion which (given the size and location of the project) should come as no surprise to anyone. Yet no environmental consideration was given to the inevitable effects of constructing additional parking facilities.

The environmental impact report (EIR) did not pretend there were no parking problems. Rather, the EIR acknowledged serious parking problems and proposed a "menu" of mitigation measures to meet the demand for 2,621 spaces. The question is whether there was substantial evidence, as required by California Environmental Quality Act (CEQA), supporting the city council's conclusion that the documented adverse environmental impacts of parking had been mitigated to a point of insubstantiality. The only mitigation measures that are relevant are those expressly found and adopted by the city council (City Council):

1. Promote regional/national conventions;

2. Provide satellite parking;

3. Promote alternative transportation modes for attendees;

4. Promote alternative transportation modes for existing area employees and visitors;

5. Construct additional parking.

Even assuming the parking reduction measures adopted by the City Council are supported by substantial evidence showing a reduction of parking problems to insignificance, the possible adverse effects of some of the mitigation measures (construction/expansion of additional parking, satellite parking, and promotion of national/regional conventions) should have been considered in the EIR. (Cal. Code Regs., tit. 14 (Guidelines) §§ 15064, subd. (d),[1] 15126, subd. (c).[2]

---

[1] Section 15064, subdivision (d) provides: "In evaluating the significance of the environmental effect of a project, the lead agency shall consider both primary or direct and secondary or indirect consequences. [¶] (1) Primary consequences are immediately related to the project such as the dust, noise, and traffic of heavy equipment that would result from construction of a sewage treatment plant and possible odors from operation of the plant. [¶] (2) Secondary consequences are related more to effects of the primary consequences than to the project itself and may be several steps removed from the project in a chain of cause and effect. For example, the construction of a new sewage treatment plant may facilitate population growth in the service area due to the increase in sewage treatment capacity and may lead to an increase in air pollution."

[2] Section 15126, subdivision (c), entitled "Environmental Impact," provides: "Mitigation Measures Proposed to Minimize the Significant Effects. Describe measures which could mini-

Here, the effects of the mitigation measures were not discussed at all. There is no discussion of possible adverse effects of building additional parking facilities or expanding existing facilities. The City does not argue that it sufficiently discussed the adverse impacts of mitigation measures. Rather, the City's position is that it was not possible or necessary to do so at this stage, because until a definite site was set, the City could not determine which mitigation measure would be selected or the size/location of new or expanded parking facilities.

The City's argument is not valid. Based on the evidence before the City Council, it was clear that the fifth option (construct additional parking) would have to be chosen, because the other four mitigation measures combined are insufficient to meet the parking demand. Thus, disregarding the option of constructing new parking, the City's projections show that only 1,070 spaces can be provided by two of the remaining four mitigation measures: promotion of alternative transportation for office workers (720 spaces) and the provision of satellite parking (350 spaces). Apart from the problem that these figures are unsupported by any evidence, the City is still left with an unmet demand of more than 1,500 parking spaces. There do not appear to be any specific figures in the EIR for the projected success of the other two mitigation measures: promoting alternative transportation for convention center attendees and promoting regional/national conventions.[3] Therefore, construction of additional spaces is not merely an option but is a reasonably foreseeable and significant action that should have been addressed in the EIR in accordance with the Guidelines and the requirement that the EIR "must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effects." (*Laurel Heights Improvement Assn.* v.

---

mize significant adverse impacts, including where relevant, inefficient and unnecessary consumption of energy. The discussion of mitigation measures shall distinguish between the measures which are proposed by project proponents to be included in the project and other measures that are not included but could reasonably be expected to reduce adverse impacts if required as conditions of approving the project. This discussion shall identify mitigation measures for each significant environmental effect identified in the EIR. Where several measures are available to mitigate an impact, each should be discussed and the basis for selecting a particular measure should be identified if one has been selected. Energy conservation measures, as well as other appropriate mitigation measures, shall be discussed when relevant. Examples of energy conservation measures are provided in Appendix F. *If a mitigation measure would cause one or more significant effects in addition to those that would be caused by the project as proposed, the effects of the mitigation measure shall be discussed but in less detail than the significant effects of the project as proposed. (Stevens v. City of Glendale, 125 Cal.App.3d 986.)*" (Italics added.)

[3] The promotion of regional/national conventions itself creates significant consequences, because the EIR states this measure "would probably" require more hotel accommodations in order to make it viable.

*Regents of University of California* (1988) 47 Cal.3d 376, 396 [253 Cal.Rptr. 426, 764 P.2d 278].)

As to construction of new parking spaces, the EIR describes a downtown Sacramento parking study (Wilbur Smith Associates, Jan. 1988), which involves proposals to expand and develop three specific parking structures that would provide a total of 2,172 spaces.[4] However, there is no discussion of the environmental effects of these proposals. Moreover, it does not appear that that study was prepared in connection with the convention center expansion, because the EIR states that at least two of those projects would be available to the general public but "could be designated for Convention Center use."

On the record before us, the City's conclusion in the EIR that the spaces identified in the Downtown Sacramento Parking Study "could be designated for convention center use" is nothing more than "[m]ere uncorroborated opinion," which does not constitute substantial evidence. (Guidelines § 15384.)

The majority correctly conclude the trial court erroneously considered a subsequent outline of a draft EIR that was not before the City at the time the convention center expansion was approved. A court's task is to determine "whether substantial evidence supports *the agency's determination.* [Citations.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 392, fn. 5, italics added.) Because the draft outline of a supplemental EIR has never been presented to the City Council, it cannot constitute evidence supporting the council's determination.[5] The document is simply a preliminary draft document, never circulated for public comment nor certified, which was lodged in the administrative record in an attempt to shore up what the City Council already did.[6]

---

[4] The EIR says the downtown Sacramento parking study notes a proposal to expand lot E (12th and I St.) to provide 381 spaces; expand the east end garage (I St. between 10th and 11th) to provide 1,058 spaces; and develop lot C (14th and H St.) to provide 733 spaces. In addition, the Hyatt Hotel is intended to provide some public parking. "This additional parking was not included in the demand analysis."

[5] At oral argument, the City asserted consideration of this document was sanctioned by the decision of our Supreme Court in *Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553 [276 Cal.Rptr. 410, 801 P.2d 1161]. I find nothing in the case supporting the City's view.

[6] In any event, the document does not help the City's case. As with the EIR, the numbers reflecting parking availability are unsupported by substantial evidence and indeed contradict the numbers in the EIR. Thus, the document refers to the downtown Sacramento parking study cited in the EIR but gives different numbers. Whereas the EIR says the three parking proposals listed in the study will provide a total of 2,172 spaces, the document says the same three proposals will create 1,669 spaces. Another contradiction is that the EIR says satellite lots will provide 350 spaces, but the document places the number at 1,300. The document fails to explain how it arrives at its figure. The document further states that elimination of

The traffic management plan does not help. It merely describes the kinds of efforts that may be made to promote alternative transportation for employees—carpooling, transit pass subsidies—but does not show how the parking needs identified in the EIR will be solved.

The record fails to contain any substantial evidence showing that the convention center expansion can be accomplished without construction of additional parking facilities. Yet, the City has failed to consider the environmental effects of the inevitable construction of parking spaces that will be required by the convention center expansion. This case sets a dangerous precedent because it allows proponents of major projects to defer a consideration of the environmental effects of constructing inevitably necessary parking structures. Once the project is approved, it can then be presented as a fait accompli in connection with the later environmental review of parking structures. "[T]he later the environmental review process begins, the more bureaucratic and financial momentum there is behind a proposed project, thus providing a strong incentive to ignore environmental concerns that could be dealt with more easily at an early stage of the project." (*Laurel Heights, supra,* 47 Cal.3d at p. 395.) Here, proponents of parking structures will be able to say, "Well, we've *got* the convention center, so what do we do with all the cars if we don't build the structures?" In my view, this is not what CEQA has in mind when it requires environmental review of all reasonably foreseeable consequences of a project. (*Id.* at p. 396.)

On the record before us, the judgment should be reversed.

A petition for a rehearing was denied May 28, 1991, and appellants' petition for review by the Supreme Court was denied August 22, 1991.

---

monthly permits in lots C and E will free up 647 spaces. I fail to see how the elimination of permits will create any new spaces or reduce demand.

The only specific information that the document adds to the EIR is that 600 spaces will be built underneath the convention center expansion site.