Filed 10/23/24

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA EX REL. ROB BONTA, ATTORNEY GENERAL, et al., <br><br>     Petitioners and Appellants, <br><br> v. <br><br> COUNTY OF LAKE, <br><br>     Respondent; <br><br> LOTUSLAND INVESTMENT HOLDINGS, INC., et al., <br><br>     Real Parties in Interest. | A165677 <br><br> (Lake County Super. Ct. Nos. CV421152, CV421193) |

Petitioners Center for Biological Diversity and California Native Plant Society challenged Respondents County of Lake and the Lake County Board of Supervisors' (collectively, the County) approval of the Guenoc Valley Mixed-Use Planned Development Project (project) proposed by Real Party in Interest Lotusland I6nvestment Holdings, Inc. (Lotusland) and certification of a final environmental impact report (FEIR) for the project adopting its findings. Petitioners argued the FEIR did not properly analyze and/or mitigate the project's impacts on evacuation routes, wildfire risk, greenhouse

---

\* Pursuant to California Rules of Court, rules 8.1100 and 8.1110, sections IV, V, and VII of this opinion are certified for publication.

1

gases, and water use.  They further argued that the County failed to properly consider project alternatives and failed to recirculate the FEIR for public review after adding significant new information.

The trial court held that the County's findings regarding the impacts on the existing community's emergency evacuation routes were not supported by substantial evidence, and thus the FEIR did not comply with California Environmental Quality Act (CEQA).  It otherwise rejected Petitioners' other challenges, which they appealed.  We too reject these other challenges to the FEIR, but we agree that its conclusory discussion of the project's potential impact of exacerbating wildfire ignitions fails to provide meaningful information for the environmental assessment required by CEQA.  Because the FEIR is invalid in part, a new environmental impact report (EIR) must be prepared, mooting Petitioners' request that the FEIR be recirculated.

## BACKGROUND

Lotusland proposed the project, a luxury resort consisting of residential estate villas, hotel units, and related infrastructure, on 16,000 acres in an unincorporated and largely undeveloped area of Lake County known as the Guenoc Valley Ranch.

Having been designated the "lead agency" for purposes of approving the project under Public Resources Code, section 21067,[1] the County first published a draft environmental impact report (DEIR).  The DEIR offered the public insight into the County's evaluation of the project's environmental impacts, the County's proffered mitigation measures, and alternatives to the proposed project.

_____

[1] All further statutory references are to CEQA provisions as codified in Public Resources Code sections 21000–21177 unless otherwise indicated. Where applicable, the CEQA guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) are denoted as "Guidelines."

Public comment letters alleged several deficiencies in the DEIR's analysis. The County published its responses to the public comments along with the FEIR in June 2020.

Petitioners and the Attorney General, on behalf of the People, submitted further comment letters maintaining that the FEIR fails to resolve many of the DEIR's issues. Most relevant here, public comment letters challenged the adequacy of disclosure and mitigation regarding Impacts 3.16-2 (exacerbating wildfire risks), 3.7-1 (generating greenhouse gas emissions), 3.9-2 (decreasing groundwater supplies), as well as the rejection of an environmentally superior alternative.

Of note, Petitioners averred the "FEIR remains deficient because it fails to acknowledge or adequately analyze the increased risk of wildfire that results from development and increasing the intensity of use in undeveloped areas subject to wildfire." While acknowledging the FEIR's wildfire prevention plan (Wildfire Plan) may reduce Impact 3.16-2, Petitioners criticized the FEIR for failing to disclose "the Project's potential to increase wildfire ignitions *as compared to existing conditions on the Project site*," particularly " 'how adding new residents will affect the potential for wildfires to start.' "

Petitioners also argued the FEIR's analysis of the project's greenhouse gas (GHG) emissions failed to correct deficiencies identified in comments to the DEIR. They applauded the inclusion "for the first time in the FEIR an administrative draft Transportation Demand Management plan" but nonetheless argued it fell short of CEQA's standards for mitigation measures and was improperly deferred. Petitioners also urged the County to "consider the use of legally adequate carbon offset program to offset the Project's unmitigated GHG emissions."

Beyond addressing their complaints in a revised FEIR, Petitioners requested that the County recirculate it.

At Lotusland's request, the Board continued its hearing. The County then published an errata to the FEIR and a supplemental report addressing the latest public comments. The errata acknowledges that "[d]evelopment of the Guenoc Valley Site would introduce additional wildfire risk factors as compared to existing conditions," including by an "increase in vehicular traffic" and an "increase [in] the number of inhabitants . . . thereby increasing the risk of wildfire due to human-caused ignitions." It also explains that the Wildfire Plan is a project commitment and "would ensure that features are incorporated into the [project] such that wildfire risks are not exacerbated." But the errata does not purport to amend the Wildfire Plan, which was last edited on June 1, 2020. However, certain fire prevention design features are included in the FEIR's Mitigation Monitoring and Reporting Plan, and the errata states the Wildfire Plan is "a component of the Proposed Project."[2]

This did not, however, assuage Petitioners' or the Attorney General's concerns. Regarding the increased wildfire risk, for example, the Attorney General noted the errata "fails to provide the required Project-specific

[2] On July 17, 2020, Lotusland's attorney sent the County a letter (Philippakis Letter) addressing several of the comment letters' concerns. The Philippakis Letter explained that, because Lotusland "voluntarily offered at the outset to mitigate any risks of wildfire it had identified," the FEIR's "analysis largely analyzed the voluntary design features" instead of "identifying risks that need to be mitigated." Although it conceded that "humans are the main cause of fire ignitions," the letter claimed the "[p]roject design features make the risks . . . inapplicable." But due to concerns raised by the Attorney General that the Wildfire Plan's "measures were discretionary," the letter assured the County that it could enforce the commitments incorporated into the Mitigation Monitoring and Reporting Plan.

analysis of increased wildfire risk" as opposed to a "general summary of wildfire research on the effects of new development on wildfires." Accordingly, the Attorney General and Petitioners sought further revisions to the FEIR and "sufficient time . . . to review and understand the wildfire risks associated with the Project."

The County did not further revise the FEIR or recirculate it after releasing the errata. Instead, on July 21, 2020 — less than a week after publishing the errata — the Board held its hearing as scheduled, at which it certified the FEIR, approved the project, and adopted the County's Findings and Facts in Support of Findings and Statement of Overriding Considerations (Findings and Statement of Overriding Considerations).

Petitioners filed writ petitions alleging the project's approval violated CEQA.[3] The petitions allege that the FEIR fails to properly disclose, analyze, or mitigate the project's wildfire and community safety impacts, greenhouse gas emissions, offsite water use, and alternatives to the project.

The trial court ruled that the FEIR violates CEQA by failing to consider the project's impact on the community's ability to evacuate from a wildfire. But it rejected Petitioners' other contentions. The court entered final judgment and issued a writ directing the County to set aside the project approvals, vacate the associated findings, and de-certify the FEIR. Petitioners appealed.[4]

---

[3] The People, represented by the Attorney General's Office, successfully moved to intervene in the action filed by the Center for Biological Diversity. The People's petition raised substantially similar issues. Months later, the trial court ordered the Petitioners' actions consolidated.

[4] The Attorney General filed a notice of appeal before reaching a settlement with Lotusland, and the appeal was dismissed. It is unclear from the briefing and the materials submitted why the AG voluntarily had its appeal dismissed.

5

## DISCUSSION

### I. CEQA

The Legislature has declared that it is the policy of the state that the procedures required by CEQA "are intended to assist public agencies in systematically identifying both the significant effects of proposed projects and the feasible alternatives or feasible mitigation measures which will avoid or substantially lessen such significant effects." (§ 21002.)  In an effort to achieve these goals, CEQA requires the preparation of an Environmental Impact Statement (EIR), the purpose of which "is to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1.)

The EIR should include, among other things, a detailed statement setting forth "[a]ll significant effects on the environment of the proposed project" and "[m]itigation measures proposed to minimize significant effects on the environment." (§ 21100, subd. (b)(1); see also Guidelines, § 15126 ["Significant Environmental Effects of the Proposed Project" and "The Mitigation Measures Proposed to Minimize the Significant Effects" shall be discussed "preferably in separate sections or paragraphs of the EIR"].)

"For each significant effect, the EIR must identify specific mitigation measures; where several potential mitigation measures are available, each should be discussed separately, and the reasons for choosing one over the others should be stated." (*Sacramento Old City Assn. v. City Council* (1991) 229 Cal.App.3d 1011, 1027 (*Sacramento Old City Assn.*).)  If the EIR identifies significant environmental effects, the public agency may approve the project only if it makes one or more of the following findings: "(a) . . . [¶]  (1) Changes or alterations have been required in, or incorporated

6

into, the project which mitigate or avoid the significant effects on the environment . . . . [¶] (3) Specific economic, legal, social, technological or other considerations . . . make infeasible the mitigation measures or [project] alternatives identified in the environmental impact report." (§ 21081; see also *Sacramento Old City Assn.*, *supra*, 229 Cal.App.3d at p. 1034.) These findings must be made for each identified significant effect "accompanied by a brief explanation of the rationale for each finding." (Guidelines, § 15091.)

However, "in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." (§ 21002.)

## II. Mandamus Standard of Review

As in other mandamus cases, we review the "agency's action, not the trial court's decision; in that sense appellate judicial review under CEQA is de novo." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) In reviewing an agency's compliance with CEQA, we review the administrative record for prejudicial abuse of discretion. (§ 21168.5.) Such abuse occurs "if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (*Ibid.*; *Vineyard*, *supra*, 40 Cal.4th at p. 426.)

We approach procedural and factual issues under two different standards of review. (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512 (*Sierra Club*).) "[W]e determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements,' " but "we accord greater deference to the agency's substantive factual conclusions." (*Ibid.*) Mixed questions of law and

7

fact are "generally subject to independent review," but a more deferential standard may be warranted in circumstances where factual questions predominate. (*Id.*, at p. 516.)

"Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); Guidelines, § 15384, subd. (a) ["substantial evidence" is "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached"].) "In determining whether substantial evidence supports a finding, the court may not reconsider or reevaluate the evidence presented to the administrative agency. (Pub. Resources Code, § 21168.) All conflicts in the evidence and any reasonable doubts must be resolved in favor of the agency's findings and decision." (*Citizens of Goleta Valley v. Board of Supervisors* (1988) 197 Cal.App.3d 1167, 1177.)

## III. Substantial Evidence Shows Wildfire Plan and Biological Resources Analyses Are Reconcilable

We first address Petitioners' contention that the FEIR fails to reconcile its Wildfire Plan and its protection for biological resources. We reject the argument.[5]

The Wildfire Plan includes animal grazing and manual vegetation removal. It provides a map showing where "grazing and manual vegetation removal" will occur. Studies also located all special status plants observed across approximately 11,550 acres — about half of the total project

---

[5] We observe that Petitioners bore their burden of showing this specific issue was raised by the Attorney General and thus exhausted the administrative remedies on this issue. (§ 21177, subd. (a); *Maintain Our Desert Environment v. Town of Apple Valley* (2004) 124 Cal.App.4th 430, 439.)

8

site — and estimated the protected species' total acreage territory and number of individuals.

Based on this information, the FEIR concludes that "[g]iven the scattered distribution of special-status plants on the [project] Site, and the existing and ongoing grazing activities, inclusion of grazing activities for the use of vegetative fuel reduction to reduce fire hazard would not result in long-term adverse impacts to special-status plants. This impact is therefore considered less than significant." Given the extensive studies and evidence supporting the County's conclusion, we do not reconsider it. (*Save North Petaluma River and Wetlands v. City of Petaluma* (2022) 86 Cal.App.5th 207, 216.)

Petitioners' reliance on *San Joaquin Raptor Rescue Center v. County of Merced* (2007) 149 Cal.App.4th 645, 655, in which the challenged EIR disclosed an increase in mining production that was "entirely inconsistent with the assurances elsewhere that there would be no increase in production" is unavailing. The County's mitigation measure to counter the impacts of vegetation clearing (MM 3.4-18) is not incompatible with the Wildfire Plan. As the FEIR explains, most sensitive habitats do not require any vegetation removal under the Wildfire Plan. Where that is not the case, MM 3.4-18 manages, and in some cases bars, the use of heavier equipment and grazing to clear vegetation. There is no irreconcilable inconsistency undermining the FEIR as an information document. (Cf. *San Joaquin Raptor Rescue Center*, at pp. 654–657.)

## IV. FEIR Did Not Adequately Analyze Wildfire Risk

While we do not pass upon the correctness of the FEIR's determination that the project's purported design features sufficiently alleviate the potential impact of human-caused wildfires, the FEIR fails to sufficiently inform the

public of this risk.  (See *Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392 (*Laurel Heights*).)  Specifically, the errata's belated mention of the project's potential to increase wildfire risks does not adequately disclose the increased risks relative to the baseline existing conditions.

### A. Governing Standards

An EIR is " 'an informational document' " central to "CEQA's fundamental goal that the public be fully informed as to the environmental consequences of action by their public officials."  (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 391, 404.)  Consequently, an EIR "shall" set forth "[a]ll significant effects on the environment of the proposed project" and "[m]itigation measures proposed to minimize significant effects on the environment."  (§ 21100, subd. (b).)[6]  "[S]ignificant effect" is defined as "a substantial, or potentially substantial, adverse change in the environment."  (§§ 21100, subd. (d), 21068.)  CEQA requires these analyses to be distinct.  (§ 21100, subd. (b); see also *Sacramento Old City Assn.*, *supra*, 229 Cal.App.3d at p. 1027.)  " 'To facilitate CEQA's informational role, the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions.' "  (*Laurel Heights*, at p. 404.)  In short, "there must be a disclosure of the 'analytic route the . . . agency traveled from evidence to action.' "

---

[6] Mitigation measures are "feasible changes in any or all activities involved in the project in order to substantially lessen or avoid significant effects on the environment."  (Guidelines, § 15041, subd. (a).)  The Guidelines define "mitigation" to include "avoiding the impact altogether by not taking a certain action," "[m]inimizing impacts by limiting the degree or magnitude of the action," "[r]ectifying the impact by repairing, rehabilitating, or restoring the impacted environment," "[r]educing or eliminating the impact over time by preservation and maintenance operations," and "[c]ompensating for the impact by replacing or providing substitute resources."  (Guidelines, § 15370, subds. (a)–(e).)

10

(*Ibid.*)

An agency's inadequate or conclusory discussion of a potentially substantial adverse change in the environment deprives the public of information necessary for informed self-government and constitutes a prejudicial abuse of discretion. (*Sierra Club, supra*, 6 Cal.5th at pp. 512–514; § 21168.5.) On review, we defer to the agency's factual finding, including which methodologies best identify and analyze significant environmental impacts. (*Sierra Club*, at p. 516.) But we independently review "whether the EIR includes enough detail ' " 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " ' " (*Ibid.*)

## B. FEIR Insufficiently Disclosed Project's Potential Adverse Effects of Increased Wildfire Risks

The errata to the FEIR discloses, under Impact 3.16-2 regarding exacerbating wildfire risks, that "[d]evelopment of the [project site] would introduce additional wildfire risk factors as compared to existing conditions." Specifically, the errata outlines — in a single paragraph — that increased human habitation in a wildlife-urban interface increases the fire risk from "arson, children playing with fire, and debris-burning"; that increased vehicular traffic increases fire risk from "sparks, catalytic converters, and discarding of cigarettes"; and that "[t]he introduction of residences within the site would create a wildland-urban interface" that increases the general potential for human-ignited wildfires. These factors, it explains, "expose project occupants to pollutant concentrations from wildfire or the uncontrolled spread of wildfire." The errata further states that "wildfires tend to cause more damage" to low density developments. And the County's staff report, released following the errata's publication, states "[t]he Final EIR acknowledges that wildfire risk from development of the Proposed

11

Project would be potentially significant" and "would result in impacts associated with increased risk of wildfire ignition."

The need for the FEIR's disclosure of the potentially substantial adverse risk of human-caused wildfire is uncontroversial given the context. (See *League to Save Lake Tahoe Mountain v. County of Placer* (2022) 75 Cal.App.5th 63, 136 ["Developing new homes and stores in a very high fire hazard area risks exacerbating the hazard . . . ."]; *California Building Industry Assoc. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 385 ["EIR should evaluate any potentially significant impacts of locating development in other areas susceptible to hazardous conditions (e.g., . . . , wildfire risk areas)"]; see Guidelines, § 15126.2, subd. (a).)[7]

Initially, the errata's information came too late. (*Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 103 (*Sierra Watch*).) "CEQA requires agencies to discuss a project's potentially significant impacts in the draft EIR and final EIR. (CEQA Guidelines, § 15120, subd. (c); see also *id.*, §§ 15125, 15126.2.)" (*Ibid.*) And an agency cannot "make up for the lack of analysis in the EIR" through post-EIR analysis. (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 131 (*Save Our Peninsula Committee*) [errata not "subjected to the same ' "critical evaluation that occurs in the draft stage" ' "].) Otherwise, the public would be denied the " ' opportunity to test, assess, and evaluate the [newly revealed information] and make an informed judgment as to the validity of

_____

[7] We note that disclosures in the County's initial study — which promises "[p]otential impacts related to wildfire will be addressed in the Wildfire section of the EIR" — does not suffice. (*Sierra Club, supra*, 6 Cal.5th at p. 520 ["The relevant informational document here is the EIR"].) Moreover, in tension with the errata, the revised FEIR still asserts that "the prospect of growth, by itself, does not create an adverse effect on the environment."

12

the conclusions to be drawn therefrom. ' " (*Id.*, at p. 131.) The same holds true for the letter from Lotusland's attorney, Katherine Philippakis, presented to the public the day before the Board hearing to approve the Project, and her oral testimony at the hearing in support of the Project. Neither the letter nor the testimony was made part of the FEIR, and therefore, cannot be said to have remedied the FEIR's insufficiencies. (See *Communities for a Better Environment v. City of Richmond* (2010) 184 Cal.App.4th 70, 88 (*Communities*) ([rejecting project proponent's post-EIR expert letter as "too little, and certainly too late, to satisfy CEQA's requirements" because "[i]t is the adequacy of the EIR with which [courts] are concerned, not the propriety of the subsequent decision to approve the Project"].)

It is fundamental to the purpose of CEQA that the public obtain a full understanding of the environmental impacts of a project from a single source relevant informational document — that being the EIR. (Cf. Guidelines § 15150, subd. (b) ["Where part of another document is incorporated by reference, such other document shall be made available to the public for inspection"]; *Sierra Club*, *supra*, 6 Cal.5th at pp. 520 ["The relevant informational document here is the EIR"].) This allows for easy access to the relevant information and direct accountability for the agency when dealing with large volumes of documents and material. Material not contained in the EIR cannot be expected to be considered; and therefore, cannot be relied upon to support an adequate EIR. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 405 [" ' "Whatever is required to be considered in an EIR must be in that formal report; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report" ' "].) This also

13

ensures the public is fully informed of the environmental risks posed by the proposed project.

The FEIR in this case did not contain the information in the errata nor the Philippakis letter or Board presentation, as such, it came too late and may not be considered when evaluating the sufficiency of the FEIR.

Moreover, even if its discussion of the project's potentially significant impacts on wildfire risks did not come too late, the errata's passing disclosure is insufficient to comply with CEQA. "[T]he adequacy of an EIR's discussion of environmental impacts is an issue distinct from the extent to which the agency is correct in its determination whether the impacts are significant." (*Sierra Club*, *supra*, 6 Cal.5th at p. 514; cf. *Laurel Heights*, *supra*, 47 Cal.3d at pp. 403–404 ["Even if the Regents are correct in their conclusion that there are no feasible alternatives . . . , the EIR is nonetheless defective" because the "treatment of alternatives was cursory at best"].) An EIR's analysis must "provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences." (Guidelines, § 15151.) The instant FEIR does not perform this function.

Specifically, the FEIR fails to reasonably describe the "additional wildfire risk factors as compared to existing conditions" that the project would "introduce" to the area. Instead, the errata points to several sources of "human-caused ignitions" — i.e., arson, debris-burning, vehicle sparks, and discarding of cigarettes — and then cites a general study finding that "increased fire education, a decline in smoking, and modern vehicles . . . have reduced the impacts of anthropogenic causes of wildfire ignitions [other than by powerlines] in recent times." It concerns us that the County did not appear to "use its best efforts to find out and disclose all that it reasonably can" about the project's impact on these risk factors. (Guidelines, § 15144.)

14

The errata in no way explains the extent to which bringing in over 4,000 new residents to the largely undeveloped project site increases the risk of human-caused wildfire over the existing baseline risk. For example, given the general decline in human-caused wildfires, how many such ignitions occur per 1,000 people in a wildland-urban interface, and how much has that rate reduced as wildfire safety and education has increased? And how many wildfires ignite per 1,000,000 miles driven by vehicles with and by vehicles without catalytic converters, and how has the mix of vehicles on public roads affected those statistics over time?[8]

The current discussion prevents decision-making and the public from adequately evaluating the merits of the Wildfire Plan. (Guidelines, § 15151; *Sierra Club*, *supra*, 6 Cal.5th at p. 514 ["adequate description of adverse environmental effects is necessary to inform the critical discussion of mitigation measures and project alternatives"].) Despite imposing no revisions to the Wildfire Plan, the errata affirms the FEIR's original conclusion that the project "would not exacerbate the risk of wildfire from existing levels *with implementation of the Wildfire Prevention Plan*." As the FEIR currently stands, there is no way to connect the dots between the "additional wildfire risk factors," which the errata concedes exist, and the Wildfire Plan's prevention strategies, which the errata does not update.

---

[8] Of course, we do not require that these specific questions be answered in the FEIR. (See *Sierra Club*, *supra*, 6 Cal.5th at p. 515 ["agency has considerable discretion to decide the manner of the discussion of potentially significant effects in an EIR"].) Nor must the risk be quantified if that is not possible. (*Id.*, at p. 520 ["if it is not scientifically possible to do more than has already been done to connect air quality effects with potential human health impacts, the EIR itself must explain why, in a manner reasonably calculated to inform the public of the scope of what is and is not yet known about the Project's impacts"].) But an EIR cannot give a mere cursory mention of potential significant impacts as the FEIR does here.

15

The errata contains a single sentence of such analysis, asserting that the Wildfire Plan's requirement of fire breaks will "reduce the risk of wildfire ignition from sparks or discarded cigarettes along project roadways." It vaguely points to the Wildfire Plan and a general decline in human-caused wildfire ignitions as support for its conclusion that the project does not exacerbate the risk of wildfire. While the Wildfire Plan comprehensively analyzes the project site's *current* wildfire risk, it does not expound on the anthropogenic risks that the errata admits development at the project site will "introduce." No component of the FEIR, therefore, discusses this aspect of the project in detail sufficient to enable the public to discern "the 'analytic route the . . . agency traveled from evidence to action.' " (*Laurel Heights*, *supra*, 47 Cal.3d at p. 404.)

The County counters that there is no need to separately discuss the project's potential adverse effects on increased wildfire risks because the Wildfire Plan's "design features" are a "central part of the [p]roject" — not mitigation measures — that reduce Impact 3.16-2 to "less than significant." But even if the Wildfire Plan's prevention strategies are properly characterized as part of the project, the FEIR still violates CEQA.[9] The dispositive issue is whether the FEIR "obfuscates required disclosure of the

_____

[9] Certainly, aspects of the Wildfire Plan — such as undergrounding power lines — reflect design choices. (E.g., *Lotus v. Department of Transportation* (2014) 223 Cal.App.4th 645, 656, fn. 8 (*Lotus*) ["composition of paving" plausibly part of design].) But we observe that other components of the Wildfire Plan, such as animal grazing, "[p]running tree limbs," and "remov[ing] vegetation debris that accumulates on [rooves]," are more naturally understood as "maintenance operations" aimed at "[r]educing . . . impacts" of a project introducing people to undeveloped, fire-prone areas. (See Guidelines, § 15370, subd. (d).) We are not persuaded that making it a project objective to be a " ' "model project" of wildfire mitigation' " converts such measures into project design features.

16

project's environmental impacts and analysis of potential mitigation measures." (*Mission Bay Alliance v. Office of Community Investment & Infrastructure* (2016) 6 Cal.App.5th 160, 185 (*Mission Bay*); cf. *Save Our Peninsula Committee, supra*, 87 Cal.App.4th at pp. 130 [finding information regarding mitigation measure disclosed in errata "does not make up for the lack of analysis in the EIR"].)  It plainly does.

Mission Bay is an instructive contrast.  There, a construction project was defined to include a transportation management plan, which in turn incorporated a special event transit service plan (Muni TSP).  (*Mission Bay, supra*, 6 Cal.App.5th at pp. 179–180.)  The court determined the EIR was adequate because it analyzed the project's environmental impacts on vehicle traffic and transit "both with and without implementation of the Muni TSP and applie[d] the same threshold standards to determine the significance of those impacts." (*Id.*, at p. 185.)  Thus, "the environmental impacts of the project on vehicle traffic and transit [were] fully disclosed in the FSEIR." (*Ibid.*)  That is not so here, where the County admits that no similar analysis occurred with and without the Wildfire Plan because the project as proposed is "the only one that Lotusland seeks to build."

Again, we do not prescribe the appropriate manner of discussing the project's potentially significant effects.  We do not hold that the County must analyze the project's environmental impacts on wildfire ignitions with and without the Wildfire Plan.  The County retains discretion in choosing the methodologies employed for analyzing environmental impacts and mitigation measures.  (*Sierra Club, supra*, 6 Cal.5th at pp. 516, 521.)  But the FEIR must sufficiently discuss the project's potential adverse effect of human-cause ignitions and analyze in some detail how the project's design (or mitigation measures) alleviates such risks.  It is not sufficient to cite a scientific study

17

unrelated to the project and summarily state that "increased fire education, a decline in smoking, and modern vehicles . . . have reduced the impacts of anthropogenic causes of wildfire ignitions." That may be true, but it does not inform the public how this evidence led the County to conclude that the Wildfire Plan eliminates those otherwise reduced — but still present — risks. (*Laurel Heights*, *supra*, 47 Cal.3d at p. 392.) Such a discussion is critical to the public's understanding of the efficaciousness of the Wildfire Plan.[10] Here, the County presents no industry standard modeling tools, no methodology or analysis for its conclusory findings, nor any other discussion of how the Wildfire Plan proposes to address the existing baseline conditions other than the Project design proposal itself. This is insufficient. Failure to separately identify and analyze the significant impacts of the fire risk to the Project area and its baseline existing conditions before proposing mitigation measures violates CEQA. (*Lotus*, *supra*, 223 Cal.App.4th at pp. 655–658.)

Because the FEIR must be revised to provide critical information about the increased risk of wildfire ignitions, Petitioners' claim that the County erred by refusing to recirculate the FEIR in light of the errata's " 'significant new information' " is undeniably moot. (See § 21092.1; see also Guidelines, § 15088.5, subd. (a)(1).)" (*Communities*, *supra*, 184 Cal.App.4th at p. 101.) "Because the EIR is invalid in part, a new EIR must be prepared, submitted for public review and comment, and certified in accord with CEQA procedures." (*Laurel Heights*, *supra*, 47 Cal.3d at pp. 391, 404.)

---

[10] Given the FEIR's failure to identify or describe with any particularity the project's potential to increase wildfire ignitions, we do not resolve whether the FEIR's mitigation of the project's wildfire impacts is deficient.

18

## V.   FEIR's Inclusion of Carbon Credit Program Does Not Violate CEQA

Petitioners challenge the FEIR's inclusion of a carbon credit program to mitigate the project's greenhouse gas (GHG) emissions on the grounds that it is ineffective, improperly deferred, and unenforceable.  We find their position meritless.

An EIR must discuss and adopt "feasible" mitigation measures that alleviate significant adverse impacts.  (§ 21002; Guidelines, § 15126.4.)  A mitigation measure is feasible if it is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors."  (§ 21061.1.)  Whether a measure is feasible is a factual finding reviewed for substantial evidence.  (*Cherry Valley Pass Acres & Neighbors v. City of Beaumont* (2010) 190 Cal.App.4th 316, 350).  Infeasible measures need not be analyzed "in any detail."  (*Ibid.*)

In reaction to the FEIR's conclusion that the project's impact due to greenhouse gas (GHG) emissions would be significant even after adopting feasible mitigation measures,[11] Petitioners' comment letter urged the County to "consider the use of a legally adequate carbon offset program."  But as a memorandum detailing the County's responses to public comments explains, carbon offset credits "cannot be considered feasible" as a mitigation measure because "there is a limited supply of verifiable, reliable, real carbon offsets,"

---

[11] The FEIR evaluates and adopts several measures to mitigate the project's significant impact on the direct and indirect generation of GHG emissions.  These include using energy efficient technology, net zero energy buildings, and renewable energy (MM 3.7-1); implementing a transportation demand management plan (MM 3.13-4 incorporated through MM 3.7-1); utilizing less polluting engines during construction (MM 3.3-1 incorporated through MM 3.7-2); and conserving oak woodland habitat and replanting oak trees (MM 3.4-16).

and "no way to sure that adequate offset credits will be available" at the time that Lotusland would need to purchase them.

Nonetheless, the errata adds a condition to the FEIR's Mitigation Monitoring and Reporting Plan requiring Lotusland to "purchase [14,865] GHG emissions credits from a [California Air Resources Board] approved registry source or project to offset the difference between the mitigated project emissions and the [relevant significance] thresholds." Meanwhile, the County's Findings and Statement of Overriding Considerations restates that "[s]pecific economic, legal, social, technological, or other considerations make infeasible additional mitigation measures or project alternatives identified in the Final EIR [regarding GHG emissions]."

Petitioners do not challenge the County's infeasibility finding. Rather, they argue that, by virtue of being in the FEIR, the carbon credit program must meet CEQA's standards for feasible mitigation measures. Indeed, Petitioners suggest that the County would have avoided any alleged defect by simply rejecting the program from the FEIR altogether.

But Petitioners cite no authority for the contention that CEQA bars considering potentially beneficial measures that agencies deem too uncertain to be feasible. (*Temple of 1001 Buddhas v. City of Fremont* (2024) 100 Cal.App.5th 456, 204 [arguments unsupported by legal authority or cogent analysis are forfeited].) And, contrary to Petitioners' contention, the program was *not* relied upon to eliminate the project's impacts. At the July 21, 2020 Board hearing, it was explained that the carbon credit program's addition would not avert the project's significant and unavoidable impact from GHG emissions "given the limited supply of carbon offsets and the uncertainty regarding the availability of offset credits throughout the life of the project." The errata does not state otherwise; it merely explains the

20

amount of carbon credits Lotusland would seek to purchase is the "difference between the total project emissions and the [state recognized 2030 service population] thresholds." Petitioners' reliance on *Golden Door Properties, LLC v. County of San Diego* (2020) 50 Cal.App.5th 467, 485 for the proposition that mitigation measures for GHG emissions must ensure that carbon credits are " 'real, additional, quantifiable, permanent, verifiable, and enforceable' " is therefore inapposite.

Moreover, Petitioners do not contend the carbon credit program will impose any adverse impacts. Thus, to the extent the addition of this program to the FEIR did not comply with CEQA, we find it does not constitute prejudicial error because its inclusion did not "deprive[] the public and decision makers of substantial relevant information about the Project's likely adverse impacts." (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 463.)

## VI. Transportation Demand Management Plan Not Improperly Deferred

We reject Petitioners' arguments that proposed mitigation measure 3.13-4 — implementing a Transportation Demand Management (TDM) — is improperly deferred and inadequate.

An EIR cannot put off formulating mitigation measures (Guidelines, § 15126.4, subd. (a)(1)(B)), but it need not be exhaustive. (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 696.) A measure's specific details " 'may be developed after project approval when it is impractical or infeasible to include those details during the project's environmental review' provided that the agency" " '(1) commits itself to the mitigation, (2) adopts specific performance standards the mitigation will achieve, and (3) identifies the type(s) of potential action(s) that can feasibly achieve that performance standard and

21

that will [be] considered, analyzed, and potentially incorporated in the mitigation measure.' " (*East Oakland Stadium Alliance v. City of Oakland* (2023) 89 Cal.App.5th 1226, 1254–1255; Guidelines, § 15126.4, subd. (a)(1)(B).) We " 'scrupulously enforc[e]' " these legislatively mandated CEQA requirements and determine de novo whether they have been followed. (*Sierra Club*, *supra*, 6 Cal.5th at p. 512.)

There was no impermissible deferral here because the TDM satisfies all three requirements. We first observe the reasonable rationale for deferring the details for mitigating the project's impact as measured by vehicle miles traveled (VMT). While the County accepted the State recommended significance threshold for VMT, the FEIR notes that a "limitation of VMT measurements is the inability to easily observe or measure them" requiring that they be estimated based on the number of vehicles observed multiplied by a probabilistic average of the distances traveled.[12] VMT is not static or even stable over time; this inherently limits the specificity of a plan to reduce VMT. (Cf. Guidelines, § 15146 ["The degree of specificity required in an EIR will correspond to the degree of specificity involved in the underlying activity which is described"].) Thus, it is "readily apparent" why specifying the TDM's details was "impractical or infeasible at the time the [F]EIR was certified." (*Preserve Wild Santee v. City of Santee* (2012) 210 Cal.App.4th 260, 281.)

The County then met the necessary conditions for deferring a mitigation measure's minutiae. First, the FEIR commits the County and

---

[12] Nonetheless, based on such estimations, the FEIR does not mask the project's significant and unavoidable impact on VMT "due to the rural nature of the project setting and associated longer distances required for travel." For this reason, the County adopted a statement of overriding considerations with respect to this impact. And it devised the TDM with VMT-reducing strategies that may be revised or augmented based on their performance.

Lotusland to the TDM. The FEIR provides that Lotusland "shall develop and submit to the County a final Transportation Demand Management Program" for the project "[p]rior to issuance of occupancy permits for Phase 1 . . . ."

Second, the FEIR adopts a specific performance standard that the TDM must achieve. It specifies the TDM's goal "shall be" reducing the project's expected VMT by 15 percent, which the TDM restates as its "minimum reduction goal." This is sufficiently concrete. (*City of Hayward v. Trustees of California State University* (2015) 242 Cal.App.4th 833, 855 (*City of Hayward*) ["The Master Plan goal to reduce drive alone vehicle trips is the performance standard that the TDM plan will strive to meet"].)

Third, the TDM identifies nearly a dozen strategies that can feasibly achieve that goal because they are "expected to collectively reduce vehicle trips by 3 to 20 percent." One, for example, includes public and private shuttle services, the latter of which is "expected to accommodate approximately 40 [percent] of resort patrons," and which together, along with a "dial-a-ride" service, are expected to reduce the project's VMT by 2–10 percent.

The TDM further requires the post-implementation efficaciousness of the strategies to be analyzed. Specifically, it requires a coordinator to "monitor daily one-way vehicle trips" and "compare these vehicle trips to the aggregate daily one-way vehicle trips anticipated based on the trip generation rates contained within the Project's DEIR." If the results reveal the TDM's measures "are not achieving the reduction goal" then Lotusland "shall adjust the TDM plan . . . in consultation with County staff." This requirement is also enshrined in the FEIR's Mitigation Monitoring and Reporting Plan. This satisfies CEQA. (See *City of Hayward, supra,* 242 Cal.App.4th at p. 855 ["The monitoring program which is an integral part

23

of the plan ensures that the public will have access to the information necessary to evaluate compliance . . . ."].)

Petitioners' related charge that there is no evidence of the enumerated strategies' effectiveness is a factual inquiry we review for substantial evidence. (*Save the Hill Group v. City of Livermore* (2022) 76 Cal.App.5th 1092, 1114.) Here, "[t]he estimated trip reductions associated with the TDM strategies are based on research compiled" by the California Air Pollution Control Officers Association and reflect the County's expert's conclusions based on that report's trip reduction methodology. This is enough, "even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a); see also *South of Market Community Action Network v. City and County of San Francisco* (2019) 33 Cal.App.5th 321, 339.)

Accordingly, we conclude that the FEIR does not improperly defer or inadequately analyze mitigation of VMT impacts.

## VII. FEIR Adequately Discloses Potential Impact of Off-Site Well

The project devises two separate water systems. Potable water would be supplied through on-site groundwater supply wells, and non-potable water "would be supplied by a combination of surface water from the on-site reservoirs, recycled from the on-site water recycling plants, and groundwater supply wells." While the FEIR anticipates on-site water supplies would adequately supply the project's non-potable water demands, it also identifies an off-site well that "may be developed" to provide a supplemental non-potable water supply "if required." Because the well's potential use is contingent on an unanticipated shortfall and because the aquifer it draws from is ill-defined, the County concluded the well would have a "potentially significant impact." Petitioners argue the County erred by "omit[ting]" disclosure of the project's potential use of the off-site well and for "mak[ing]

24

no effort to quantify the amount of groundwater the Project will draw" from that source. We disagree.

While an EIR "necessarily involves some degree of forecasting" that requires an agency to "use its best efforts to find out and disclose all that it reasonably can" (Guidelines, § 15144), "the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible" (Guidelines, § 15151), and an agency may "terminate discussion of [an] impact" if its investigation "finds that [it] is too speculative for evaluation." (Guidelines, § 15145.) Thus, rather than speculate about project impacts, the agency "may discuss potential project impacts at a 'level of specificity . . . determined by the nature of the project and the rule of reason.' " (*Sierra Watch, supra*, 69 Cal.App.5th at p. 105; see Guidelines, § 15146.) Whether further disclosure and analysis by an EIR is reasonably feasible "presents a mixed question of law and fact, which usually is subject to independent review and is subject to substantial evidence review only when questions of fact predominate." (*King & Gardiner Farms, LLC v. County of Kern* (2020) 45 Cal.App.5th 814, 843 (*King & Gardiner Farms, LLC*).)

As discussed below, disclosure and analysis of the well's potential environmental impacts turn on the foreseeability of the well's actual use and the water source from which it draws. We find these factual questions predominate the inquiries, and therefore review for substantial evidence. (*King & Gardiner Farms, LLC, supra*, 45 Cal.App.5th at pp. 843–844.)

Here, the FEIR discloses that non-potable water would be supplied by onsite reservoirs, onsite recycled wastewater, and groundwater wells. Those groundwater wells would consist of existing onsite irrigation wells and "[i]f necessary, an off-site high production well . . . ." Based on these supplies, the FEIR determines "availability of water supplies [even] during dry water

years is projected to exceed projected water demands."  Moreover, given "current groundwater and surface water supplies" — which does *not* include the undeveloped offsite well — the non-potable water supply would exceed demand during a "critical dry year" by thousands of acre feet.  And during normal water years, the water supply from surface water entitlements (e.g., onsite reservoirs) and recycled water exceed projected water demands without any groundwater from any source.

Nonetheless, the County evaluated the potential offsite well's production capacity and the underlying groundwater basin.  The FEIR explains that "[p]ump test results indicate that the existing well has a high production capacity measured at 1,100" gallons per minute.  Because of the existing well's "marginal" condition, a new well would need to be constructed that would "yield high flows over 1,000" gallons per minute.  Use of the offsite "well has the potential to draw down the Collayomi Valley Groundwater Basin," but the County's investigation into "regional studies and local well data" reveals that "the nature and extent of the aquifer that would be utilized is not well defined."  This is because it is not "a uniform alluvium aquifer" but "a series of layers and lenses of permeable or semi-permeable materials that are partially interconnected (Wagner and Bonsignore, 2019)."  Accordingly, "the amount of water that could be withdrawn without substantially decreasing groundwater supplies has not been determined."

Petitioners do not challenge these findings, nor can they given the substantial evidence supporting them.  Rather, they fault the County for "mak[ing] no effort to quantify the amount of groundwater the Project will draw from offsite."

Petitioners' argument is misplaced.  The County unambiguously explains that the well would only be used "[i]f necessary," which it cannot

26

reasonably forecast given its uncontested finding that the well's use is contingent on extreme circumstances that would not arise under the County's most conservative model of water supplies during "critical dry years." (See *Sierra Watch*, *supra*, 69 Cal.App.5th at p. 105 ["EIR was not required to supply speculative estimates" of construction's duration].) Petitioners point to language in the FEIR stating the offsite well would "be used as a primary source of non-potable water" but fail to emphasize that sentence concludes with the caveat "if required," which the record reveals is exceedingly unlikely. For this reason, Petitioners' reliance on *Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829–830, where the EIR failed to evaluate the impact of supplying 12,000 to 15,000 gallons of water per day that "[t]he EIR disclose[d] . . . will be consumed," is unavailing. We therefore find the FEIR was "prepared with a sufficient degree of analysis" and specificity under the rule of reason regarding the amount of water the offsite well would draw. (Guidelines, §§ 15151, 15146.)

We are also unpersuaded that the County should be reasonably expected to disclose more information regarding the well's potential impact on the underlying aqueduct or Middletown's water supply. The County relies on sufficient evidence in support of its finding that the ill-defined nature of the aqueduct precluded a conclusive evaluation of the well's impacts on the aquifer. Coupled with the unlikely and uncertain use of the offsite well, the FEIR's limited discussion of the off-site well's potential impact is reasonable.[13] (Guidelines, §§ 15145, 15146; see also *Sierra Watch*, *supra*, 69 Cal.App.5th at p. 105.)

_____

[13] These same circumstances justify the deferred nature of Mitigation Measure 3.9-3, which imposes "safe yield analysis and monitoring" of the offsite well. (See Guidelines, § 15126.4, subd. (a)(1)(B); see also Section VI,

## VIII. FEIR Properly Rejected Alternative C

Petitioners contend the FEIR rejected a less environmentally impactful alternative — Alternative C — as infeasible without the properly supported findings that CEQA requires. We are unpersuaded.

As our Supreme Court has explained, " '[o]ne of [an EIR's] major functions . . . is to ensure that all reasonable alternatives to proposed projects are thoroughly assessed.' " (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 565, italics omitted.) This assessment is critical because "agencies should not approve projects as proposed if there are feasible alternatives . . . available which would substantially lessen the significant environmental effects of such projects." (§ 21002.) Thus, an EIR must "describe a range of reasonable alternatives" that "would feasibly attain most of the basic objectives of the project but would avoid or substantially lessen any of the significant effects of the project." (Guidelines, § 15126.6, subd. (a); *Citizens of Goleta Valley,* at p. 566; *Laurel Heights*, *supra*, 47 Cal.3d at p. 400.)

Once such alternatives are identified, however, the agency has discretion to reject them if the agency "make[s] one or more of the findings required by section 21081." (*City of Marina v. Board of Trustees of California*

---

*ante*, p. 21.) The FEIR commits itself to the measure, adopts specific performance criteria for a safe yield — i.e., "avoid drawdown of groundwater beyond 300 feet of the well" — and identifies actions to achieve this — i.e., "incorporate[ing] pump testing," identifying monitoring wells, limiting pumping rates and durations based on hydraulic analysis, "submit[ting] annual monitoring reports" on quarterly groundwater pumping and groundwater level data, and requiring the analysis to be "certified by a Registered Professional Engineer or Registered Geologist." This is sufficient. (See Guidelines, § 15126.4, subd. (a)(1)(B); see also *East Oakland Stadium Alliance v. City of Oakland, supra*, 89 Cal.App.5th at pp. 1254–1255; Section IV, *ante*, p. 9.)

*State University* (2006) 39 Cal.4th 341, 350; see § 21002 ["in the event specific economic, social, or other conditions make infeasible such project alternatives . . . , individual projects may be approved in spite of one or more significant effects thereof"]; § 21002.1, subd. (c) [similar].)

Pursuant to paragraph (3) of that provision, an agency may reject an alternative after finding it is infeasible. (§ 21081, subd. (a)(3).) Specifically, the agency may determine that "[s]pecific economic, legal, social, technological, or other considerations, including considerations for the provision of employment opportunities for highly trained workers, make infeasible the mitigation measures or alternatives identified in the environmental impact report." (*Ibid.*) And if the agency makes such an infeasibility finding, then it must also "find[] that specific overriding economic, legal, social, technological, or other benefits of the project outweigh the significant effects on the environment." (§ 21081, subd. (b); *Preservation Action Council v. City of San Jose* (2006) 141 Cal.App.4th 1336, 1353 (*Preservation Action Council*).)

Notably, an agency does not abuse its discretion by rejecting alternatives as "infeasible" based on "policy considerations" or project objectives. (E.g., *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 1001 (*California Native Plant*) ["an alternative 'may be found infeasible on the ground it is inconsistent with the project objectives as long as the finding is supported by substantial evidence in the record' "]; *Planning and Conservation League v. Department of Water Resources* (2000) 83 Cal.App.4th 892, 918 [alternatives must be evaluated "in relation to the objectives of the project"]; *City of Del Mar v. City of San Diego* (1982) 133 Cal.App.3d 401, 417 [alternative "reasonably rejected . . . in view of the social and economic realities"].) Moreover, a reasonable reading of a project's

" 'fundamental purpose' " in light of its listed objectives may defeat a proposed alternative's feasibility. (*Yerba Buena Neighborhood Consortium, LLC v. Regents of University of California* (2023) 95 Cal.App.5th 779, 798 (*Yerba Buena Neighborhood Consortium, LLC*); *In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1165.) An agency's findings are presumed correct, and the burden is on the party seeking mandamus to prove otherwise. (*California Native Plant, supra*, 177 Cal.App.4th at p. 997.) Thus, we review the County's finding that Alternative C would be infeasible for substantial evidence. (*Ibid.*)

The instant FEIR explains the project was designed "to align with the objectives of the Middletown Area Plan Special Study Area, and existing County planning documents." Those plans "identif[y] the need to develop more tourist destinations" and "encourage development of resorts with more commercial uses than residential." The FEIR then sets forth the project's specific development and economic objectives. Relevant here, these objectives include: (1) "Develop a luxury international destination resort that generates financial profits for the investor"; (2) "Meet Middletown Area Plan objectives by incorporating smart growth principles and low density development strategies while providing high end luxury accommodations and services"; (3) "Propose a mix of resort, agriculture, and residential uses consistent with the Lake County General Plan policies, Zoning regulations, Middletown Area Plan, and economic development goals and policies"; (4) "Plan for long term growth of the County with a significant fiscal contribution toward the County's community goals of new economic, employment, and housing opportunities."

After briefly discussing alternatives eliminated from consideration, the FEIR evaluated three potentially feasible alternatives to the project: no

project; a reduced density, similar development footprint; and a high density, compact development footprint (Alternative C). Under Alternative C, all 400 hotel units envisioned by the project would be combined into one large hotel, average lot size for the 1400 residential estates and 450 resort residential units would drop from 4.8 acres to 0.8 acres, and many of the resort amenities would be reduced. The FEIR concludes Alternative C would be environmentally superior to the project because it would result in fewer impacts.

But due to the FEIR's finding that "this alternative would not fully meet objectives related to the development of a luxury destination resort with sufficient amenities to attract a diverse range of guests and residents," the County concluded in its Findings and Statement of Overriding Considerations that Alternative C was infeasible. This was based, in part, on information submitted by Lotusland "indicating that they would expect price reductions for residential lots of at least 35 [percent] if they are unable to offer larger estate lots, and resort amenities, which are in turn supported by the scale of homes and resort units within the community."

Petitioners argue that the FEIR "contained no substantial analysis as to Alternative C's economic infeasibility." Moreover, they contend the evidence submitted by Lotusland is too unreliable to constitute substantial evidence supporting the County's conclusion that Alternative C would reduce the price of residential lots and threaten the "financial feasibility of this alternative."[14]

---

[14] This information came in the form of two letters from the founding partner of luxury real estate firm IMI Worldwide Partners that attest to self-reinforcing market forces behind luxury development — i.e., "larger estate-sized homesites" with luxury amenities command "luxury prices" which in turn "is critical to support the luxury amenities." One letter claims

31

Even if we agreed, however, this flaw is not dispositive. (See *Save Panoche Valley v. San Benito County* (2013) 217 Cal.App.4th 503, 523 [where an agency cites several independent reasons why an alternative is infeasible, the agency's determination will be upheld if one reason is supported by substantial evidence].) Citing *California Native Plant*, *supra*, 177 Cal.App.4th 1336, the County's Findings and Statement of Overriding Considerations expressly states "Alternative [C] is overall less capable of achieving the full scope of project objectives." The County's finding therefore goes beyond the alternative's economic feasibility. Indeed, the foremost justification the County states in rejecting Alternative C is that it "is less capable of achieving the full array of project objectives" and "would not meet the objective of achieving a balance in housing densities consistent with a luxury resort." We find this carries significant weight because the project's objectives make plain that creating a "luxury" resort defined by low density residences is fundamental to the project's purpose. (Cf. *Yerba Buena Neighborhood Consortium, LLC*, *supra*, 95 Cal.App.5th at p. 798.)

The County's conclusion reflects the FEIR's evaluation of Alternative C's inability to satisfy several of the project's objectives. That Alternative C would cut the average lot sizes from 4.8 acres to 0.8 acres — an 83 percent reduction — and reduce the total number of luxury amenities is uncontested. The FEIR states the goal of "meet[ing] Middletown Area Plan objectives by incorporating smart growth principles and low-density development strategies" would not be met because the density of Alternative C "would not

_____

experience with "similar developments," but the letters differ without explanation on Alternative C's impact on revenues. The letters do not discuss costs, profits, or contain facts evaluating the project's particular circumstances. (See *Preservation Action Council*, *supra*, 141 Cal.App.4th at p. 1352 [fact showing an alternative is merely less profitable is insufficient to demonstrate it is financially infeasible].)

32

provide as many luxury accommodations." The FEIR also determines Alternative C would only partially meet the project objective regarding "the County's community goals of new economic, employment, and housing opportunities" due to Alternative C's "reduced resort amenities." And it would only partially meet the objective for "[p]ropos[ing] a mix of resort, agriculture, and residential uses consistent with the Lake County General Plan policies, Zoning regulations, Middletown Area Plan, and economic development goals and policies" because "density would be higher than encouraged under current policies."[15]

The FEIR's analysis that smaller and denser accommodations and reduced amenities would not meet these objectives is reasonable. (*Citizens of Goleta Valley v. Board of Supervisors*, *supra*, 52 Cal.3d at p. 569; see also § 21082.2, subd. (c) ["reasonable assumptions predicated upon facts" constitutes substantial evidence].) Accordingly, substantial evidence supports the County's discretionary judgment that the alternative would not meet key project objectives.

Petitioners' other allegation that the FEIR and the County's findings are contradictory is meritless. It is true that the County's Findings and Statement of Overriding Considerations states Alternative C "only marginally lessens the Proposed Project's potentially significant and unavoidable impacts," while the FEIR states that "future phases under Alternative C" would eliminate the potential for significant and unavoidable

---

[15] Another objective that the FEIR claims Alternative C will not meet is "develop[ing] a luxury international destination resort that generates financial profit" because "Alternative C would not provide enough resort amenities or large enough lots . . . ." This argument relies, at least in part, on an argument about financial feasibility, which we do not address. But it also reinforces our view that the fundamental purpose of the project is to build a luxury resort.

impacts to scenic vistas." Petitioners ignore, however, that the FEIR also concludes that Alternative C would still result in "significant and unavoidable aesthetic impacts in Phase 1 due to construction," and "[a]ll significant and unavoidable impacts related to Important Farmlands, greenhouse gas emissions, noise, and traffic and transportation would still occur." This is consistent with the County's finding that Alternative C would only "marginally" reduce impacts compared to the project. Petitioners' authority, *California Clean Energy Committee v. City of Woodland* (2014) 225 Cal.App.4th 173, 205, where the lead agency made an "unexplained switch from a rationale of economic infeasibility to environmental inferiority as the basis for rejecting" an alternative, is therefore inapposite. There is substantial evidence in the record to support the FEIR's conclusion to reject Alternative C.

## DISPOSITION

For the reasons discussed above, we reverse the trial court's decision that the FEIR adequately disclosed the project's impact on increasing the area's existing wildfire risks. Because the FEIR must be revised, Petitioners request that the FEIR be recirculated is moot. In all other respects, the judgment is affirmed.

The cause is remanded to the trial court, which shall issue an order granting the Petitioners' petition for a writ of mandate vacating the County's certification of the EIR and approval of the project. (§ 21168.9, subd. (a).) Pursuant to section 21168.9, subdivision (b), the trial court shall retain jurisdiction over this action to ensure compliance with the peremptory writ issued. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rules 8.278(a)(3), (5).)

34

                                          HITE, J.*

We concur:


STREETER, Acting P. J.
GOLDMAN, J.

*People ex rel. Rob Bonta v. County of Lake* (A165677)

---

  * Judge of the Superior Court of California, City and County of San Francisco, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

                                          35

Trial Judge:        Hon. J. David Markham

Trial Court:        Lake County Superior Court

Attorneys:          Peter J. Broderick and Aruna M. Prabhala for Center for
                    Biological Diversity, for Petitioner and Appellant.

                    Lozeau Drury LLP, Rebecca L. Davis and Brian B. Flynn,
                    for Petitioner and Appellant.

                    Rob Bonta, Attorney General, Andrew R. Contreiras, Aarti
                    S. Kewalramani, and Nicole U. Rinke, Deputy Attorneys
                    General, for Petitioner and Appellant.

                    Anita L. Grant and Nicole Danielle Johnson, County
                    Counsels, for Defendant and Respondent.

                    Miller Starr Regalia, Arthur F. Coon and Matthew C.
                    Henderson, for Defendant and Respondent.

                    Coblentz Patch Duffy & Bass LLP, Jonathan R. Bass,
                    Charmaine G. Yu, and Sarah E. Peterson, for Real Party in
                    Interest.

                    Farella Braun & Martel, Katherine Philippakis and Linda
                    Sobczynski, for Real Party in Interest.